Opinion
BAXTER, J.
A jury convicted Richard Stitely (defendant) of the first degree murder of Carol Unger. (Pen. Code, § 187, subd. (a).)[1] A related special circumstance of murder during the commission of unlawful sodomy was found true. (§ 190.2, subd. (a)(17)(D).) The jury also convicted defendant of the separate crime of forcible rape against Valery C. (§ 261, subd. (a)(2).)
After a penalty trial, the jury returned a death verdict. The trial court declined to modify the verdict (§ 190.4, subd. (e)), and sentenced defendant to death for the sodomy murder. The court also imposed and stayed a determinate term on the noncapital rape count. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)
We find no prejudicial error at defendant’s trial. The judgment will be affirmed in its entirety.
*523 I. Guilt Phase Evidence
A. Murder of Carol Unger and Related Sex Crimes
1. Carol’s Disappearance
Carol Unger and her husband, Delbert, frequented the White Oak Inn, a bar located near their home.[2] They went there both together and separately. The couple had one child, Joey, during their marriage. Carol had other children from a prior relationship, including her son Billy.
At 8:30 p.m. on January 19, 1990, Billy called Delbert, who was alone at the White Oak Inn. Delbert left the bar and went to a restaurant with Billy. They came home at 11:00 p.m. Joey was there, but Carol was gone. Delbert stayed awake until 1:00 a.m. He heard nothing strange outside the house, which was well lit in front by a streetlight.
Meanwhile, beginning at 9:30 the same night, several witnesses saw Carol at the White Oak Inn.[3] Defendant, a semi-regular patron, was there too. Carol sat at the bar, and defendant sat at a table. According to both the bartender, Anthony Russo, and the waitress, Hazel Parrott, Carol and defendant each drank two or three beers. Neither seemed intoxicated.
Another regular patron, Shirley Cooper, saw Carol ask two or three men, including defendant, to dance with her. Carol often danced with men who frequented the bar, even when her husband was present. After one dance, defendant returned to his table and Carol sat on a bar stool. Cooper then saw defendant looking or staring at Carol.
Carol eventually asked the bartender, Russo, to call a taxi because she wanted “to go home.” Defendant intervened by offering her a ride and asking where she lived. She accepted the offer, and canceled her cab request. At some point, Carol asked Russo whether he knew defendant well. Russo said “no,” but saw no reason to decline the ride. By all accounts, Carol and defendant left the bar together around midnight. This was the last time she was seen alive.
When Carol failed to return home, Delbert called and visited the White Oak Inn. He also reported her missing to police.
*524 2. Discovery of Carol’s Body
Around 11:00 a.m. on January 20, 1990, the day after Carol left the bar with defendant, Edward Berg found her body in an alley behind his workplace. It was lying partially underneath the comer of Berg’s company van. He called the police. The police found no purse or wallet. They identified Carol through Delbert’s report.
Detective John Coffey and a coroner’s investigator, Debrah Kitchings, described the scene, as follows: Carol was lying on her back with her legs spread apart, naked from the waist down. Her jeans and underpants were gathered around one ankle, her shirt was bunched at the breast line, and her jacket was resting underneath the hip area. Carol’s numerous injuries included scrape marks on the back and choke marks on the neck. Pieces of foam rubber were found on her neck and head, in her underwear, and on the ground. It appeared Carol had been sexually assaulted, dragged into the alley, and dumped under the van.
3. Medical Testimony About Carol’s Injuries
Dr. Joseph Cogan, who performed the autopsy, testified that Carol was strangled to death, based on the following premortem injuries: Blood congestion and petechial hemorrhages in the jaw and face showed that pressure had been applied to the neck, and that circulation had stopped to the head, for a “long” time. Internal hemorrhaging from blunt force trauma appeared on both sides of the neck and around the eyes and ears. Carol’s thyroid cartilage, or Adam’s apple, was fractured—an injury consistent with manual strangulation. However, the fracturing of the cricoid cartilage, which sits deeper in the neck, required greater pressure from a choke-hold maneuver. Dr. Cogan also linked certain marks on the front of Carol’s neck to a ligature pulled from behind.
Regarding nonlethal injuries, Dr. Cogan testified that two cuts on Carol’s left hand were caused by a sharp instrument, and were consistent with defensive knife wounds. He also described abrasions and bmises on the extremities, two round marks or bums on the head, and bmising on the scalp. The skin on Carol’s back had been scraped or dragged on a hard surface both before and after death.
Dr. Cogan found multiple signs of sexual activity. There were two tears in the anal opening, as well as tears, contusions, and hemorrhaging inside the anal cavity. The anal injuries were inflicted before death, were caused by blunt force trauma, and were consistent with penile penetration. Dr. Cogan found no vaginal tears. Because the vaginal opening was “marital,” the lack of tearing was not inconsistent with forcible penetration. Some darkening or reddening of the labia could have been a contusion.
*525 Investigator Kitchings testified that she saw “trauma” in Carol’s vaginal and anal areas at the crime scene. Kitchings also estimated the time of death by comparing air and liver temperatures at 3:30 p.m. on January 20, 1990, a few hours after Carol was found. She had most likely been dead for 15 hours (i.e., since 12:30 a.m. on January 20, 1990). However, she could have died anywhere from 12 to 20 hours earlier (i.e., between 7:30 p.m. on January 19, 1990 and 3:30 a.m. on January 20, 1990).
The evidence included an autopsy report and attached toxicology report. The parties stipulated that Carol’s toxicology tests revealed a .26 percent blood-alcohol content, a result indicating intoxication.
4. Physical Evidence and Forensic Tests
As discussed below, the police found tom seat cushions and foam debris during a search of defendant’s car. Criminalist Susan Johnson testified that there was no difference in color, chemical composition, or cellular structure between the foam found on Carol’s body and the foam seized from defendant’s car. The origin could have been the same.
Criminalist Lloyd Mahanay made cotton swabs and microscope slides of the fluids in Carol’s vagina and anus. Though he did not personally conduct such tests, he opined that any sperm found on these items would reflect ejaculation into each orifice. Mahanay mled out the possibility that semen from the vagina could have contaminated the anal swab, or that ejaculation on or in the vagina could have leaked into the anus.
Serologist Alison Ochiae testified that Carol had type O blood, and that defendant was a type A secretor. A secretor is one whose blood type appears in other bodily fluids. Ochiae found sperm on the vaginal swabs and anal slides that Criminalist Mahanay had prepared. Using the ABO method, Ochiae identified defendant as a possible sperm donor. She also linked him to a stain on Carol’s jacket.
The parties stipulated that Criminalist Mark Taylor performed DNA tests that could conclusively match the genetic materials in semen with the genetic materials in blood. The DNA pattern found on Carol’s vaginal and anal swabs matched the DNA pattern obtained from defendant.
5. Defendant’s Statements to Police
Based on information obtained at the White Oak Inn and other bars, detectives learned that defendant worked at a radiator repair shop. On February 2, 1990, Detective Coffey and his partner visited defendant at work. *526 He agreed to accompany them to the police station. When Detective Coffey peered inside defendant’s station wagon, he saw tom seats and foam debris similar to the foam found on Carol’s body. Police impounded the car. They later searched it with defendant’s consent.
Defendant received and waived his constitutional rights during the ride to the police station. Detective Coffey questioned defendant at the station, assisted by Detective Medina. Coffey recorded the interview without defendant’s knowledge. The jury heard the interview and received the transcript.
Defendant first told detectives that he last visited the White Oak Inn on January 26, 1990, and had not been there in the preceding two months. Though he often went to bars on Friday nights, defendant recalled staying home on Friday, January 19, 1990, to save money. He denied knowing Carol. Detective Coffey asked about Valery C., a teenager who stayed with defendant and his daughter. Defendant said that Valery had falsely accused him of rape because he told her to pay rent or move.
Detective Coffey said that witnesses saw Carol leave the bar with defendant on January 19, 1990. Defendant then admitted that he drove her home. He recalled seeing both a red van and a shadowy figure outside her house.[4] Supposedly, as Carol left the car, she took a steak knife from her purse. Though defendant was scared, Carol did not threaten him with the knife, and instead mentioned her “old man.”[5] Defendant claimed he sped away, and that nothing sexual or violent happened. He initially lied because he did not want to upset Carol’s husband.
Detective Coffey theorized that Carol died during a fight with defendant. Defendant said he might “stop talking,” and Coffey reaffirmed his right to do so. Nevertheless, defendant continued to assert his innocence, saying, “The only thing you can prove is I took her out of that bar, man.” Defendant denied any fight. He repeated that Carol “didn’t threaten” him with the knife or otherwise seem interested in “using” it on him.[6]
*527 Detective Coffey remarked that debris in Carol’s hair looked like debris in defendant’s car. Defendant then conceded a struggle, giving the following account: When they got to her house, Carol—who was “drunker than hell”—asked to visit another bar. Defendant refused because he needed to go home. Defendant saw someone exit the house, and watched Carol draw the knife from her purse. She exited and reentered the car. He sped away at her request. Carol again asked to go to another bar. Defendant stopped the car. Scared and unsure of her intent, he squeezed her hand to expel the knife. She tried to bite him, and he grabbed her hair. Carol opened the door. Defendant kicked her in the face, ejecting her from the car. He did not strangle or kill her.
Detective Coffey told defendant he intended to test bodily fluids found at the crime scene. Defendant then admitted having vaginal intercourse with Carol in his car. Coffey asked whether the act was “mutual,” and defendant said, “yeah.” He reportedly initiated the sexual encounter, and Carol mentioned the lack of intimacy in her marriage. Defendant said he had previously withheld this information because another “bitch,” Valery C., had falsely accused him of rape. Defendant adamantly denied having anal sex with Carol.
Regarding Carol’s injuries, defendant acknowledged that he could have unintentionally “caused her death.” However, he consistently maintained that he kicked her only once—possibly hitting her neck, chest, and shoulder—and that he never strangled or punched her.
Finally, at Detective Medina’s request, defendant clarified that the sex act occurred after they left Carol’s house, while the knife was out of sight. They subsequently fought because Carol—though drunk and “out of it”—wanted to go to another bar, and he wanted to go home. In this final account, Carol held the knife down by her side when defendant kicked her from the car. She said she wanted to “hurt somebody.” However, she did not assault, threaten, or injure him with the knife. Defendant claimed Carol was alive and clothed when he left her at a spot different from where her body was found.[7]
B. Rape of Valery C.
The main witness on the noncapital rape count was the victim, Valery C. Valery testified that in June 1989, she was 16 years old, and five and one-half months pregnant. She had been evicted from her own apartment, and did not live with her mother because they did not get along. Valery therefore *528 accepted an invitation from defendant’s daughter, S., to live with defendant and S. According to Valery, defendant never told her to pay household expenses or to move out. He slept on the couch, and the girls shared the lone bedroom.
Valery testified that on June 28, 1989, she returned to the apartment at 11:00 p.m. Defendant was in the front room. S. was gone. Valery entered the bedroom and closed the door. She put on a long button-down shirt and underwear, and got into bed. This was the first time she and defendant were alone together.
According to Valery, the following events occurred: Defendant entered the bedroom and shut the door. He climbed on top of Valery, who was underneath the blankets. Scared and confused, she started to scream. Defendant grabbed her throat with one hand and threatened to kill her if she did not keep quiet. Defendant choked her for at least 20 seconds, causing her to cough when he finally released his grip.
Valery continued: Defendant pinned Valery’s arm over her shoulder. Saying she could not live there for free, defendant moved the blankets and unbuttoned her shirt. He kissed her breasts, and placed his fingers into her vagina. Defendant then lowered her underpants, unzipped his trousers, and penetrated her vagina. Defendant ignored Valery’s plea to stop because of her unborn baby. Instead, he withdrew his penis, placed Valery on her side, and then resumed intercourse. After ejaculating, defendant left the room. He did not smell like alcohol or seem intoxicated.
Valery buttoned her shirt and cleaned herself in the bathroom. When she entered the living room, defendant apologized and said she could call the police. She put on a pair of pants and ran to meet her boyfriend in the park. Crying and shaking, she told him what happened.
Almost immediately, at 11:45 p.m., Valery’s boyfriend called the police. As reflected by the 911 recording admitted at trial, both Valery and her boyfriend told the dispatcher about the rape. Valery testified that she also called her mother.
Valery continued her account: Valery and her mother promptly went to the police station and reported the rape to a female officer. Later, at the hospital, Valery declined an examination because no female doctor was available. The next day, Valery discarded the button-down shirt because it repulsed her. She retrieved her belongings from defendant’s apartment, and never returned to live there.
*529 The investigating officer, Angela Hougen, testified that she saw no bruises on Valery C. However, Valery was distraught at the police station, and became more upset at the hospital while waiting for an exam.
C. Defense
Defendant presented no evidence at the guilt phase.
II. Penalty Phase Evidence
A. Prosecution Case
1. Other Violent Crimes
The evidence showed that defendant, who was 41 years old at the time of the capital crime, committed prior violent crimes against his ex-wife and their two daughters. Specifically, M., who was 20 years old at the time of trial, testified that defendant adopted her as a child while married to her mother, Deborah. According to ML, defendant sodomized her in the family’s Texas home for three and one-half years, starting when she was five years old. During this period, defendant also sodomized his biological daughter S., who is two years younger than M. The acts usually happened on Saturdays when Deborah ran errands with her and defendant’s youngest child, R.
M. described a typical sexual encounter with her father as follows: defendant told M. to undress in the bathroom and to rub Vaseline in her anal area. She complied out of fear. While M. either leaned on the toilet or lay on the floor, defendant placed his penis in her anus. Defendant ignored M.’s pleas to stop even though she bled and expressed pain. Afterwards, defendant told M. to clean herself and to bring her younger sister, S., into the bathroom. M. then saw defendant sodomize S., and heard S. scream. Defendant threatened to kill both the girls and their mother if the sex acts were disclosed. He smelled like liquor, but was not always drunk, when these acts occurred.
M. testified that in 1981, at age eight, she disclosed these acts first to the babysitter and then to Deborah (the mother of M. and S.) M. also signed an affidavit in Texas concerning the matter.
Deborah testified that she and defendant married in 1973, and divorced 10 years later. According to Deborah, defendant abused alcohol, and the pair often fought. At different times, defendant assaulted Deborah by (1) pointing a gun at her head and threatening to shoot her, (2) wielding a knife and threatening to stab her, (3) grabbing scissors and lunging at her, and (4) striking her with a makeup mirror and cutting her head. Each act occurred in front of the children.
*530 Deborah testified that, while awaiting trial, defendant said, “[I]f they find M., she’ll hang me.” Despite some initial doubts, Deborah believed defendant had molested their daughters. She also described him as both smart and a good provider. No one, including defendant, deserved execution in Deborah’s view.
2. Victim Impact Evidence
Delbert Unger described Carol as “his whole life.” He identified a photograph of them together, which was admitted into evidence.
The pathologist, Dr. Cogan, testified that Carol was probably strangled for several minutes or more before she died, and that she likely experienced both cardiovascular and emotional distress. It took great force to break both neck cartilages—trauma that would cause pain in a five person. Dr. Cogan explained that a lit cigarette could have made the round marks or bums on Carol’s head, and that most of the nonfatal injuries occurred while she was alive and susceptible to pain.
B. Defense Case
1. Character Evidence
Three associates in the radiator repair business testified on defendant’s behalf: (1) Wyatt Crawford, whose family employed defendant for 15 years in Texas, (2) Richard Donohue, who employed defendant in California before the capital crime, and (3) Eugene Pace, who employed defendant in California at the time of the crime. These witnesses agreed that defendant was competent, courteous, and reliable. His illiteracy did not affect his work. Defendant never came to work impaired by alcohol. The parties stipulated that he quit the first California job because others drank alcohol at work. When defendant was arrested in Texas, his employer, the Crawford family, posted his bail.
2. Lack of Criminal Record
The parties stipulated that defendant had no prior felony or misdemeanor convictions. Another stipulation addressed the acts of sodomy reported to police in 1981 and described by M. at trial. A Texas grand jury considered the matter shortly after it was reported and declined to proceed against defendant. The case could have been refiled.
3. Good Conduct in Custody
Deputy Sheriff Rust testified that defendant behaved well in jail during the capital trial. The parties stipulated that inmates imprisoned for life without *531 the possibility of parole (LWOP) receive the highest security available outside of death row. If defendant remained discipline-free, he could teach auto repair and earn privileges in prison.
IIL Pretrial issues
A. Severance
Defendant claims the trial court erred in denying his motion to sever the special circumstance murder of Carol from the forcible rape of Valery C. He argues here, as below, that the prosecution improperly joined the two counts in order to bolster weak circumstantial evidence that defendant murdered Carol in the course of a sexual assault. A federal due process violation allegedly occurred. We disagree.[8]
The trial court properly found that both offenses belonged to “the same [assaultive] class.” (§ 954.) Joinder therefore was statutorily allowed. (Ibid.; People v. Arias (1996) 13 Cal.4th 92, 126 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Defendant has never disputed this threshold point.
Thus, defendant must show that a substantial danger of prejudice compelled severance. (People v. Catlin (2001) 26 Cal.4th 81, 110 [109 Cal.Rptr.2d 31, 26 P.3d 357].) We ask whether the denial of severance was an abuse of discretion, given the record before the trial court. (People v. Davis (1995) 10 Cal.4th 463, 508 [41 Cal.Rptr.2d 826, 896 P.2d 119].) A pretrial ruling that was correct when made can be reversed on appeal only if joinder was so grossly unfair as to deny due process. (People v. Arias, supra, 13 Cal.4th 92, 127; People v. Johnson (1988) 47 Cal.3d 576, 590 [253 Cal.Rptr. 710, 764 P.2d 1087].)
Cross-admissibility is the crucial factor affecting prejudice. (People v. Valdez (2004) 32 Cal.4th 73, 120 [8 Cal.Rptr.3d 271, 82 P.3d 296].) If evidence of one crime would be admissible in a separate trial of the other *532 crime, prejudice is usually dispelled. (People v. Bradford (1997) 15 Cal.4th 1229, 1315-1316 [65 Cal.Rptr.2d 145, 939 P.2d 259].)
Invoking the law applicable at the time of his trial, defendant argues that prior sex crimes may be used only for a relevant nondispositional purpose, like identity (Evid. Code, § 1101, subd. (b)), and that the two joined counts are not sufficiently “distinctive” to show that the same person who raped Valery C. also attacked Carol. (People v. Ewoldt (1994) 7 Cal.4th 380, 403 [27 Cal.Rptr.2d 646, 867 P.2d 757]; but see Evid. Code, § 1108, subd. (a) [new posttrial statute providing that, in'sex crime prosecutions, § 1101 does not bar defendant’s other sex crimes if such evidence is not barred under § 352]; People v. Falsetta (1999) 21 Cal.4th 903, 911-912 [89 Cal.Rptr.2d 847, 986 P.2d 182].) However, the degree of similarity required to prove mental state is far less exacting. The two acts need only be sufficiently similar to suggest that the defendant probably had the same intent each time. (People v. Ewoldt, supra, 7 Cal.4th at p. 402.)
While the trial court avoided the issue, evidence at both the preliminary hearing and trial that defendant choked and raped Valery C. suggested that he acted with similar criminal intent while having sexual intercourse with Carol—a victim who was also choked. (See People v. Carpenter (1997) 15 Cal.4th 312, 379 [63 Cal.Rptr.2d 1, 935 P.2d 708] [not guilty plea disputes all elements of charged crime, including intent].) Indeed, jurors could not convict defendant of first degree murder on a felony-murder-rape theory unless they found “specific intent to commit rape” beyond a reasonable doubt. (People v. Haley (2004) 34 Cal.4th 283, 314 [17 Cal.Rptr.3d 877, 96 P.3d 170].) The chance that defendant acted with innocent intent with Carol is sharply reduced by evidence that he committed a forcible, nonconsensual sex act upon Valery C. a few months earlier. (People v. Carpenter, supra, 15 Cal.4th at p. 379.)
Also, as the prosecutor stated in closing argument, the jury could reasonably infer from Valery C.’s rape accusation that defendant killed Carol to “cover up” the sexual assault, and to prevent her from reporting the crime as Valery had done. This inference of a motive to kill, coupled with evidence that Carol was last seen alive with defendant and that she died soon after they left the bar, constituted circumstantial evidence that he intended, deliberated, and premeditated her death for purposes of proving first degree murder. (People v. Cummings (1993) 4 Cal.4th 1233, 1284 [18 Cal.Rptr.2d 796, 850 P.2d 1].)
However, any lack of cross-admissibility is not, by itself, sufficient to show prejudice and bar joinder. (§ 954.1; People v. Osband (1996) 13 Cal.4th *533 622, 667 [55 Cal.Rptr.2d 26, 919 P.2d 640] .)[9] Here, the trial court considered other factors commonly used to assess prejudice, including the likelihood of inflaming the jury, the strength of the evidence, and the availability of the death penalty. (People v. Marshall (1997) 15 Cal.4th 1, 27-28 [61 Cal.Rptr.2d 84, 931 P.2d 262].) The court rejected the notion that the noncapital count was more “passionate” than the capital count, noting that the latter crime involved both sexual violence and murder. The court also determined that circumstantial evidence of defendant’s role in Carol’s murder seemed “pretty strong” compared to Valery C.’s firsthand account of the rape.
This reasoning is persuasive. In short, defendant fails to demonstrate that the denial of severance involved an abuse of discretion or caused gross unfairness at his trial. As in other cases, we reject the claim. (E.g., People v. Marshall, supra, 15 Cal.4th 1, 27-28 [noncapital sex crime properly joined with subsequent similar capital crime]; People v. Davis, supra, 10 Cal.4th 463, 507-509 [same].)
B. Miranda Claim.
Defendant argues that he invoked his privilege against self-incrimination by suggesting he might “stop talking” to the police on February 2, 1990, and that Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (Miranda) barred his subsequent statements during the same interview. The trial court purportedly erred in denying a motion to suppress such evidence. We disagree.
Evidence at the suppression hearing consisted primarily of Detective Coffey’s testimony and the transcribed interview. The relevant facts are as follows: Coffey and another officer met defendant at work and said they were investigating a homicide. Defendant was cordial and offered to help. He agreed to talk at the police station and voluntarily entered the police car for this purpose. Defendant was not placed under arrest and was free to decline the ride. Meanwhile, detectives impounded defendant’s car. He sat in the police car and calmly watched the process.
The evidence further established that during the ride to the station, no discussion about the criminal investigation occurred. However, in mentioning *534 his marital history in Texas, defendant referred to women as “bitches.” Concerned that defendant might discuss the capital crime, Detective Coffey read defendant his Miranda rights from an official card. Defendant said he understood his rights, and agreed to waive each one. No other conversation occurred in the police car.
The record of the suppression hearing also showed that defendant received no new Miranda warnings at the station. Officers placed him in an interview room, activated the tape recorder, and asked questions. After defendant admitted that he gave Carol a ride, Detective Coffey suggested that the pair fought. The following exchange then occurred:
DEFENDANT: “Okay. I’ll tell you. I think it’s about time for me to stop talking.” (Italics added.)
COFFEY: “You can stop talking. You can stop talking.”
DEFENDANT: “Okay.”
COFFEY: “It’s up to you. Nobody ever forces you to talk. I told you that. I read you all that (untranslatable).”
DEFENDANT: “Well, I mean (untranslatable) God damn accused of something that I didn’t do. I’m telling you the truth. And you’re not believe [sic] me. You’re not believing me. I’m telling you the truth.”
COFFEY: “Richard, the only problem is, I can prove otherwise. The only reason I—listen to me.”
DEFENDANT: “The only thing you can prove is I took her out of that bar, man. That’s all I did. That’s the only thing I’ve done.”
Detective Coffey explained at the suppression hearing that if defendant had decided to stop talking, the interview would have ended. Because defendant’s statements were unclear in this regard, Coffey did not believe that questioning had to stop. Nevertheless, in an abundance of caution, Coffey “reinforced” the notion that defendant was free to exercise his right to silence.
After hearing argument on both sides, the trial court found no Miranda violation and declined to suppress defendant’s statements. The court determined that defendant voluntarily waived his Miranda rights before the interview. The court also determined that he never stopped speaking freely with the police and that he declined the detective’s offer to do so.
*535 To protect the Fifth Amendment privilege against self-incrimination, a person undergoing a custodial interrogation must first be advised of his right to remain silent, to the presence of counsel, and to appointed counsel, if indigent. (Miranda, supra, 384 U.S. 436, 444, 467-473, 478-479.) As long as the suspect knowingly and intelligently waives these rights, the police are free to interrogate him. (Id. at pp. 444, 475, 479.) However, if, at any point in the interview, the suspect invokes his rights, questioning must cease. (Id. at pp. 444-445, 473-474; see Edwards v. Arizona (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 101 S.Ct. 1880] [questioning cannot resume until request for counsel is granted or suspect restarts interview].) Statements obtained in violation of these rules are inadmissible to prove guilt in a criminal case. (Miranda, supra, 384 U.S. at pp. 444, 4764-77, 479; see People v. Sapp (2003) 31 Cal.4th 240, 266 [2 Cal.Rptr.3d 554, 73 P.3d 433]; People v. Neal (2003) 31 Cal.4th 63, 79-80 [1 Cal.Rptr.3d 650, 72 P.3d 280].)
In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect “must unambiguously” assert his right to silence or counsel. (Davis v. United States (1994) 512 U.S. 452, 459 [129 L.Ed.2d 362, 114 S.Ct. 2350] (Davis), italics added.) It is not enough for a reasonable police officer to understand that the suspect might be invoking his rights. (Ibid.) Faced with an ambiguous or equivocal statement, law enforcement officers are not required under Miranda, supra, 384 U.S. 436, either to ask clarifying questions or to cease questioning altogether. (Davis, supra, 512 U.S. at pp. 4594-62.) Of course, such an approach may disadvantage suspects who, for emotional or intellectual reasons, have difficulty expressing themselves. (Id. at p. 460.) However, a rule requiring a clear invocation of rights from someone who has already received and waived them “avoid[s] difficulties of proof” (id. at p. 458), and promotes “effective law enforcement.” (Id. at p. 461.)
As in prior cases, we follow Davis here. (People v. Gonzalez (2005) 34 Cal.4th 1111, 1125 [23 Cal.Rptr.3d 295, 104 P.3d 98]; People v. Michaels (2002) 28 Cal.4th 486, 510 [122 Cal.Rptr.2d 285, 49 P.3d 1032]; People v. Crittenden (1994) 9 Cal.4th 83, 129-130 [36 Cal.Rptr.2d 474, 885 P.2d 887].) A reasonable officer in Detective Coffey’s position would have concluded that defendant’s first remark (“I think it’s about time for me to stop talking”) expressed apparent frustration, but did not end the interview. Defendant agrees that this statement was ambiguous under Davis, supra, 512 U.S. 452, and that the police were not required to stop asking questions at that point. Nevertheless, Coffey did stop the interrogation, and twice reminded defendant of his right to “stop talking.” This cautious approach gave defendant a chance to clarify whether questioning should proceed—something defendant concedes the officer was not constitutionally required to do.
*536 Contrary to what defendant claims, he did not clarify his ambiguous remarks or clearly invoke his constitutional privilege by saying “Okay.” This nonsubstantive response merely implied that defendant understood what he had just heard, and that he could “stop talking” if he so chose. Detective Coffey’s subsequent comments also do not support defendant’s related claim that he was badgered into resuming the interrogation. Consistent with his neutral stance throughout the exchange, Coffey again reminded defendant that talking was optional (“[i]t’s up to you”), and alluded to the prior Miranda warning (“I read you all that”). However, instead of exercising the right to silence that Detective Coffey purposefully “reinforced,” defendant protested his innocence and continuing talking about the crime. Under the circumstances, nothing prevented Coffey from continuing the exchange. We therefore uphold admission of the entire police interview at trial.[10]
C. Death Qualification of Jurors
1. Sequestration Issues
Defendant insists the trial court erred by failing to conduct the entire death-qualifying voir dire “individually and in sequestration” as set forth in Hovey v. Superior Court (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301] (Hovey). He claims violations of his federal constitutional rights to due process and an impartial jury.
Before jury selection, and on its own motion, the trial court determined that Hovey, supra, 28 Cal.3d 1, did not apply. This ruling was correct. Defendant’s trial occurred after voters approved Proposition 115, which added new section 223 to the Code of Civil Procedure. (See Tapia v. Superior Court, supra, 53 Cal.3d 282, 299-300 [applying statute to proceedings held after Prop. 115 took effect on June 6, 1990].) Then, as now, the statute provided that the voir dire of prospective jurors in capital cases “shall, where practicable, occur in the presence of the other jurors.” (Code Civ. Proc., *537 § 223.)[11] This provision had the intent and effect of abrogating the sequestration rule of Hovey, supra, 28 Cal.3d 1, which was not constitutionally compelled. (See id. at p. 80 [invoking court’s “supervisory authority over California criminal procedure”]; see also People v. Navarette (2003) 30 Cal.4th 458, 490 [133 Cal.Rptr.2d 89, 66 P.3d 1182]; People v. Slaughter (2002) 27 Cal.4th 1187, 1199 [120 Cal.Rptr.2d 477, 47 P.3d 262]; People v. Box (2000) 23 Cal.4th 1153, 1180 [99 Cal.Rptr.2d 69, 5 P.3d 130]; People v. Waidla (2000) 22 Cal.4th 690, 713 [94 Cal.Rptr.2d 396, 996 P.2d 46].) We reject defendant’s contrary claim.[12]
Defendant alternatively complains that to the extent the court decided that group voir dire was “practicable” (Code Civ. Proc., § 223), it applied statutory law in a manner that denied him due process and an impartial jury. Prospective jurors allegedly gave monosyllabic, unconsidered, and parroted answers that concealed their true views on capital punishment. The record does not support the claim.
Initially, the trial court advised counsel of its intent to apply Code of Civil Procedure section 223, and of the procedures that would be used. Thus, the court said it would assume primary responsibility for conducting the oral examination, and that counsel would be allowed to ask appropriate follow-up questions. Prospective jurors, the court said, would be examined as a group in open court. However, the court made clear that many questions, including some involving capital punishment, would be asked at the bench on a select basis. Counsel were told to “expect to approach the bench quite a bit,” because the court planned to ask “sensitive” questions and to probe “exotic” answers in this private manner.
*538 Prospective jurors completed a 25-page questionnaire, which they signed under penalty of perjury. One section—six pages and 14 questions— concerned capital punishment. To enhance questioning, the court gave counsel advance copies of the questionnaires in the same order in which each prospective juror would be orally examined. The court said it planned to make preparatory notes on “every single one” of its copies of the questionnaires.
As promised, the court began death qualification by asking each prospective juror, in open court, four questions similar to ones appearing on the questionnaire. These questions sought to discover whether prospective jurors would “automatically” vote for a certain penalty (Witherspoon v. Illinois (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 88 S.Ct. 1770] (Witherspoon), italics omitted), and whether their views on capital punishment would “ ‘prevent or substantially impair’ ” the performance of their duties in keeping with their oath and the court’s instructions. (Wainwright v. Witt (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844] (Witt) [clarifying the Witherspoon standard].)[13]
Depending upon the answers given either orally or in writing, the trial court often asked follow-up questions about the person’s views on capital punishment. In many instances, such clarification occurred at the bench so that other prospective jurors could not hear the exchange. The court permitted counsel to ask additional questions, particularly as to matters discussed at the bench.
Based on these facts, and as a threshold matter, it appears the defense had ample opportunity to object to the manner in which the trial court conducted group voir dire under applicable statutory law, and to propose individual sequestered voir dire as a solution to any perceived problems. Thus, as the Attorney General maintains, defendant’s failure to raise any such complaint below forfeits the issue on appeal. (People v. Vieira (2005) 35 Cal.4th 264, 287-288 [25 Cal.Rptr.3d 337].)
The claim lacks merit in any event. Defendant is wrong insofar as he implies that no individual, sequestered examination on capital punishment occurred. We also cannot conclude that the trial court’s decision to ask questions both in open court and at the bench produced meaningless, lockstep answers. Indeed, these procedures enabled counsel on both sides to challenge *539 certain individuals for cause—sometimes successfully—based on their death penalty views. Defendant provides no “specific example of how questioning prospective jurors in the presence of other jurors prevented him from uncovering juror bias.” (People v. Navarette, supra, 30 Cal.4th 458, 490.) Thus, consistent with other post-Proposition 115 cases upholding similar limited sequestration procedures, we find no constitutional or other error. (E.g., People v. Waidla, supra, 22 Cal.4th 690, 713-714 [same trial judge and procedures as in present case].)
2. General Adequacy of Questioning
Defendant asserts that other deficiencies in death qualification prevented him from adequately questioning prospective jurors, and deprived him of federal due process guarantees. For instance, defense counsel objected to the “breakneck speed” of voir dire, and asked the trial court to slow down by “about 15 percent.” Defendant also claims the court made too few inquiries, as evidenced by its use of four standard questions and by its rejection of two proposed defense questions.[14]
Defendant did not frame his complaints about the pace and scope of voir dire below in terms of a due process violation. However, assuming without deciding that this federal claim has been preserved (see People v. Yeoman (2003) 31 Cal.4th 93, 117-118, 133 [2 Cal.Rptr.3d 186, 72 P.3d 1166] (Yeoman) [federal constitutional claim not waived when legal standard and relevant facts are essentially the same as state law claim timely raised at trial]), no constitutional or other error occurred.
Recent decisions of this court have emphasized the importance of meaningful death-qualifying voir dire. We have reminded trial courts of their duty to know and follow proper procedure, and to devote sufficient time and effort to the process. (See People v. Stewart, supra, 33 Cal.4th 425, 454-455; People v. Heard (2003) 31 Cal.4th 946, 966-967 [4 Cal.Rptr.3d 131, 75 P.3d 53].) At bottom, both the court and counsel “must have sufficient information regarding the prospective juror’s state of mind to permit a reliable determination as to whether the juror’s views [on capital punishment] would ‘ “prevent or substantially impair” ’ the performance of his or her duties.” (People v. *540 Stewart, supra, 33 Cal.4th at p. 445.) Otherwise, reversible error can occur. (E.g., id. at pp. 446-452 [over defense objection, court erroneously excused five prospective jurors for cause based on inherently ambiguous responses to legally flawed questionnaire]; People v. Heard, supra, 31 Cal.4th at pp. 964—966 [over defense objection, court erroneously excused one prospective juror for cause based on ambiguous answers to imprecise and incomplete oral examination].)
Nonetheless, the trial court has broad discretion over the number and nature of questions about the death penalty. We have rejected complaints about “hasty” (People v. Navarette, supra, 30 Cal.4th 458, 487-488) or “perfunctory” voir dire. (People v. Hernandez (2003) 30 Cal.4th 835, 855 [134 Cal.Rptr.2d 602, 69 P.3d 446].) We also have found no error where the court relied heavily on three, four, or five general questions tracking language from Witherspoon, supra, 391 U.S. 510, and Witt, supra, 469 U.S. 412, 424. (E.g., People v. Hernandez, supra, 30 Cal.4th at pp. 855-856; People v. Navarette, supra, 30 Cal.4th at p. 487; People v. Cunningham (2001) 25 Cal.4th 926, 973-974 [108 Cal.Rptr.2d 291, 25 P.3d 519]; People v. Tuilaepa (1992) 4 Cal.4th 569, 586 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) These cases found voir dire to be adequate because the court and/or counsel asked additional questions to clarify ambiguous responses and to reliably expose disqualifying bias.
Such is the case here. Both the court and counsel posed follow-up questions where necessary to glean prospective jurors’ views on penalty. Defendant cites no instance in which the trial court (1) erroneously retained a prospective juror who should have been excused for cause, (2) erroneously excused for cause a prospective juror who should have been retained, (3) decided any challenge for cause absent sufficient information to do so, or (4) allowed a biased juror to serve in the case. Hence, defendant has not shown that the pace or scope of death qualification—including rejection of two defense questions—constituted an abuse of discretion or violated his constitutional rights.
IV. Guilt Phase Issues
A. Sufficiency of the Evidence
Defendant claims insufficient evidence supports both first degree murder theories presented at trial: (1) murder in the commission of forcible rape, and (2) willful, deliberate, and premeditated murder. Federal due process guarantees allegedly compel reversal of the murder count. We disagree.
*541 1. Rape Murder
Defendant notes that he could be convicted of first degree murder under a felony-murder-rape theory if he accomplished sexual intercourse against Carol’s will by means of force or fear. (See § 261, subd. (a)(2); People v. Maury (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1].) He insists the prosecution did not prove these elements because there was no real injury to Carol’s vagina, and because he told detectives that she consented to vaginal sex. However, viewing all of the evidence most favorably to the judgment, we reject the claim. (People v. Johnson (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]; see Jackson v. Virginia (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781].)
The evidence suggested that defendant formed a sexual interest in Carol inside the bar the night she was killed. After only one dance, defendant looked or stared at her with such intensity that his conduct was noticed by at least one bystander. When Carol told the bartender that she planned to leave by taxi, defendant—who apparently continued to watch her closely— volunteered to drive her home. Defendant made this offer even though he did not know where Carol lived, and even though the pair hardly knew each other.
The jury could infer that Carol had no similar interest in defendant. By asking him to dance, Carol treated defendant no differently than other bar patrons with whom she danced the same night or on prior occasions. She did not follow defendant to his table afterwards, but returned to her barstool instead. Moreover, Carol balked at being alone with defendant. Though she eventually accepted a ride from him, she first asked the bartender whether it was safe to go.
In a related vein, Carol told the bartender that she was going home to her family. The jury could have accepted this statement at face value, and concluded that Carol did not intend to have sexual relations with defendant after she left the bar. Such evidence was “clearly probative” of both lack of consent and rape, and supported conviction under the prosecution’s first degree felony-murder theory. (People v. Rowland (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897] [rape-murder victim’s statement about going home to sleep, which she made after enduring the defendant’s sexual advances in bar, suggested she did not thereafter consent to sex with him].)
Against this backdrop, defendant apparently saw Carol consume alcohol in the bar. He also later told the police that she was drunk while riding in his car. To rational jurors, defendant might have believed that Carol’s condition would make her receptive or vulnerable to his sexual advances once they were alone together.
*542 However, subsequent events indicate that Carol rejected such advances and that—consistent with evidence in the Valery C. case—defendant forced her to have sex anyway. Carol likely died within 30 minutes of leaving the bar with defendant. During that time, a violent struggle occurred in his car, as evidenced by Carol’s defensive and other injuries, the seat foam stuck to her body, and defendant’s own statements. Jurors also learned that he penetrated and ejaculated into her vaginal and anal cavities. Given the compressed time frame, and the sheer number of violent and sexual acts, the jury could reasonably conclude that they were part of one continuous criminal transaction in which defendant forced Carol to submit to both vaginal and anal intercourse against her will.
Defendant highlights his statements to police indicating that Carol consented to vaginal sex, and that they fought afterwards about whether to visit another bar. However, the jury could have discredited this account. (See, e.g., People v. Berryman (1993) 6 Cal.4th 1048, 1084 [25 Cal.Rptr.2d 867, 864 P.2d 40] [finding substantial evidence that consensual sex did not precede violence, and that violence accompanied sex].) Defendant initially denied knowing Carol or being in the bar the night she was killed. When Detective Coffey disclosed contrary evidence, defendant admitted driving Carol home, but insisted no sex or violence occurred. Only after Coffey implied that defendant’s semen would be found in Carol’s body did he admit vaginal intercourse. He also eventually admitted a struggle in his car. In addition, defendant denied anal intercourse—a stance inconsistent with medical, blood, and DNA evidence indicating that defendant forcibly sodomized Carol. Faced with defendant’s changing stories and with evidence contradicting much of what he said, jurors could infer that none of his exculpatory statements about sex were true, and that he lied to defeat both sodomy and rape charges.
Contrary to what defendant further implies, the lack of vaginal injury does not preclude the jury from finding rape or prevent this court from upholding that determination on appeal. (People v. Berryman, supra, 6 Cal.4th 1048, 1084; see People v. Griffin (2004) 33 Cal.4th 1015, 1027 [16 Cal.Rptr.3d 891, 94 P.3d 1089] [rape involves force sufficient “to overcome the will of the victim,” and does not require evidence that such force “physically facilitated sexual penetration or prevented the victim from physically resisting her attacker”].) Here, of course, the jury was free to accept testimony by Dr. Cogan and investigator Kitchings describing apparent trauma to Carol’s vagina, e.g., bruised labial skin. The inference that such injury occurred during nonconsensual sex was strengthened by evidence that Carol’s body was found naked from the waist down with her legs spread apart. (People v. Berryman, supra, 6 Cal.4th at p. 1084.) Such degrading circumstances could have convinced jurors that there was nothing lawful about defendant’s sexual encounter with Carol, including the act of vaginal intercourse.
*543 In sum, we find sufficient evidence to support defendant’s conviction of first degree murder under a felony-murder-rape theory.
2. Premeditated Murder
Defendant argues that evidence of premeditation and deliberation was insufficient to support the first degree murder conviction. Under this approach, Carol’s strangulation was impulsive or accidental. Defendant points to the lack of any evidence that he procured a weapon in advance or planned the killing. Suggesting he had no motive to kill, defendant notes that he and Carol were virtual strangers who met on friendly terms in the bar.
An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse. (People v. Perez (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159], applying People v. Anderson (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].) However, the requisite reflection need not span a specific or extended period of time. “ ‘ “Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly (People v. Bolin (1998) 18 Cal.4th 297, 332 [75 Cal.Rptr.2d 412, 956 P.2d 374].)
Appellate courts typically rely on three kinds of evidence in resolving the question raised here: motive, planning activity, and manner of killing. (People v. Perez, supra, 2 Cal.4th 1117, 1125, applying People v. Anderson, supra, 70 Cal.2d 15, 26-27.) These factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation. (People v. Pride (1992) 3 Cal.4th 195, 247 [10 Cal.Rptr.2d 636, 833 P.2d 643].) However, “[w]hen the record discloses evidence in all three categories, the verdict generally will be sustained.” (People v. Proctor (1992) 4 Cal.4th 499, 529 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) In conducting this analysis, we draw all reasonable inferences necessary to support the judgment. (People v. Perez, supra, 2 Cal.4th at p. 1124, citing People v. Johnson, supra, 26 Cal.3d 557, 578.)
As noted, the murder occurred during a sexually motivated attack. It appears defendant became fixated upon Carol after she asked him to dance. He paid close attention to her words and movements afterwards, and made sure she did not take a taxi home. The evidence further indicated that not long after they drove away from the bar, and while they were alone in his car, defendant forcibly raped and sodomized Carol, and subjected her to lethal violence. The jury could reasonably have believed that defendant killed Carol “to silence her as a possible witness to her own sexual assault.” (People v. Pride, supra, 3 Cal.4th 195, 247.)
*544 It also appears defendant planned the fatal confrontation to some extent. After watching Carol much of the night, he offered her a ride home. Far from being altruistic, this offer could reasonably be seen as a pretext for the pair to be alone. Such circumstances made Carol vulnerable not only to sexual assault, but also to murder. Indeed, as revealed during the police interview, defendant knew when he left the bar with Carol that Valery C. had formally accused him of rape. The jury could have concluded that defendant decided before the murder to ensure that Carol, a subsequent rape victim, did not survive to report the crime.
The manner of killing also suggests premeditation. The pathologist, Dr. Cogan, testified that lethal pressure had been applied to Carol’s neck for a “long” time. This evidence suggests defendant had ample opportunity to consider the deadly consequences of his actions. (See, e.g., People v. Davis, supra, 10 Cal.4th 463, 510 [strangulation of sexual assault victim for up to five minutes suggested deliberate plan to kill her].) However, instead of easing the pressure on Carol’s neck (as he did during the rape of Valery C.), defendant used multiple means of strangulation, namely, manual choking sufficient to break the thyroid cartilage, use of a choke hold sufficient to break the cricoid cartilage, and application of a ligature sufficient to damage the neck. Such acts seem calculated to ensure death. (See People v. Bonillas (1989) 48 Cal.3d 757, 792 [257 Cal.Rptr. 895, 771 P.2d 844] [describing ligature strangulation as inherently deliberate act].)
Accordingly, we find substantial evidence of first degree premeditated murder, and decline to reverse the conviction on this ground.
B. Evidentiary Rulings
1. Autopsy Photographs
In several hearings held outside the jury’s presence, the court and counsel debated the admissibility of autopsy photographs. The disputed items included three photos of Carol’s dissected neck (exhibit Nos. 46, 47, and 48), and two photos of her dissected anus (exhibit Nos. 61 and 62).
As noted further below, the prosecution’s offer of proof included voir dire testimony by the pathologist, Dr. Cogan, that all five photographs played a critical role in explaining his views on sexual trauma and the cause of death. The defense countered by arguing that the pictures were unduly gruesome and prejudicial. Hence, to prevent admission of the neck photographs, defense counsel offered to stipulate to strangulation as the cause of death. Counsel also sought to exclude the anal photographs to prevent jurors from mistakenly blaming defendant for surgical damage caused by the autopsy procedure itself.
*545 The trial court ruled that none of the photographs was exceptionally bloody or gruesome, and that all plainly supported the prosecution’s case. Declining to sanitize the crime by excluding this evidence, the court concluded that its probative value substantially outweighed any prejudicial impact. (See Evid. Code, § 352.)
Defendant now contends that admission of the photographs constituted an abuse of discretion and violated his rights to due process and a reliable verdict under the federal Constitution. We reject the claims.
Defendant did not seek to exclude this evidence on constitutional grounds below. However, assuming without deciding that this federal claim has been preserved (see Yeoman, supra, 31 Cal.4th 93, 117-118, 133), no error occurred. The neck photographs showed that multiple strangulation methods and sustained pressure caused deep injuries in the form of hemorrhaging and cartilage fractures while Carol was alive. Such evidence supported the intent to kill and premeditation elements of the first degree murder charge, and weakened any inference of a rash killing. Similarly, photographs inside the anal cavity revealed tearing and bleeding consistent with forcible penetration before death—information that supported the sodomy-murder special circumstance. We reject defendant’s claim that photographs are irrelevant or inadmissible simply because they duplicate testimony, depict uncontested facts, or trigger an offer to stipulate. (People v. Crittenden, supra, 9 Cal.4th 83, 132-133; People v. Pride, supra, 3 Cal.4th 195, 243.)
Nor did the trial court err in concluding that relevance outweighed prejudice. The photographs are unpleasant, but not to the point of distracting the jury from its proper function. Contrary to what defendant assumes, jurors could “distinguish between the wounds inflicted from the murder and the disfigurement caused by the autopsy.” (People v. Welch (1999) 20 Cal.4th 701, 751 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Also, any overlap between photographs was insubstantial, particularly since Dr. Cogan relied on each one during his testimony. (See, e.g., People v. Cain (1995) 10 Cal.4th 1, 29 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)
We have upheld the use of autopsy photos to prove guilt in other capital trials, including images of dissected tissue and excised organs. (E.g., People v. Weaver (2001) 26 Cal.4th 876, 932-934 [111 Cal.Rptr.2d 2, 29 P.3d 103]; People v. Medina (1995) 11 Cal.4th 694, 754-755 [47 Cal.Rptr.2d 165, 906 P.2d 2]; People v. Cain, supra, 10 Cal.4th 1, 27-29.) We do so again here.
2. Detective Coffey’s Interview Techniques
The prosecution called Detective Coffey to describe the murder investigation, including defendant’s statements at the police station. When first *546 examined on the latter topic, Coffey mentioned specific interview techniques used in this case. They included speaking in a stem voice and disclosing incriminating evidence whenever it seemed defendant was “not being truthful.”
A bench conference then occurred in which the court and counsel discussed the logistics of presenting the recorded interview to the jury—a recording that was three and one-half hours long. During this conference, the court authorized the prosecution to elicit additional testimony concerning Coffey’s reasons for asking defendant certain questions. The court also overruled defense counsel’s objection that the interview itself provided the “best evidence,” and that the proffered testimony was unnecessary.
Hence, when describing defendant’s statements about his conduct on January 19, 1990, Detective Coffey repeatedly testified that defendant changed his story when confronted with conflicting evidence. Coffey twice said that this process exposed apparent “lies” on defendant’s part. Defense counsel objected throughout this exchange solely on grounds the prosecution asked Coffey leading and argumentative questions, and assumed facts not in evidence.
Defendant now contends the trial court allowed Detective Coffey to attack defendant’s veracity in violation of state law rales restricting both expert and lay opinion testimony on the issue. (See Evid. Code, §§ 800, 801; People v. Melton (1988) 44 Cal.3d 713, 744 [244 Cal.Rptr. 867, 750 P.2d 741]; People v. Sergill (1982) 138 Cal.App.3d 34, 38-40 [187 Cal.Rptr. 497]; but see People v. Padilla (1995) 11 Cal.4th 891, 946-947 [47 Cal.Rptr.2d 426, 906 P.2d 388] [suggesting that Cal. Const., art. I, § 28, subd. (d), known as Prop. 8’s Truth-in-Evidence provision, repealed such rules for crimes committed after its June 1982 effective date].) The ruling supposedly usurped the jury function (thereby violating the Fifth, Eighth, and Fourteenth Amendments), and allowed the prosecutor to exploit defendant’s “lies” in closing argument.
We reject these claims. First, as noted by the Attorney General, defendant did not seek to exclude the evidence below on any theory raised here. As in prior cases involving a failure to object on similar grounds, the claims have been forfeited on appeal. (People v. Anderson (1990) 52 Cal.3d 453, 478 [276 Cal.Rptr. 356, 801 P.2d 1107].)
Second, defendant misreads the record. Detective Coffey highlighted the twists and turns in a long interrogation. Nothing in this testimony or the trial court’s rulings indicated that Coffey was offering an opinion for direct jury consideration on the issue of defendant’s credibility. No reasonable juror *547 would have viewed the evidence this way. Moreover, Coffey’s testimony mirrored the interview heard by the jury, including defendant’s own admissions about lying and changing his account. Just as we find no flaw in the questions the court allowed the prosecutor to ask, we find nothing harmful in the answers Coffey gave.
3. Evidence Carol Left the Bar with Another Man
During opening remarks and, later, on cross-examination of bar patron Cooper, the defense tried to inform the jury that Carol left the White Oak Inn with other men before January 19, 1990, the day of the murder. Each time, the trial court sustained the prosecution’s objection, and barred such evidence, absent an in limine offer of proof establishing its relevance.
The issue arose again on cross-examination of bartender Russo. Abiding by the court’s ruling, defense counsel moved outside the jury’s presence to ask Russo whether, consistent with his preliminary hearing testimony, he saw Carol leave the bar with a man other than her husband in the weeks before the murder. Defendant argued that Carol’s behavior with other men was admissible under Evidence Code section 1103, subdivision (a)(1) to prove that she acted the same way with defendant the night she died.[15] Defendant insisted that exclusion of the evidence would violate his constitutional right to a fair trial. The prosecution renewed its relevance objection.
After a hearing, defendant’s motion was denied. The court mled that to the extent the defense sought to imply that Carol had a history of consenting to sex with men after leaving the bar, the proffered evidence violated Evidence Code section 1103, subdivision (c)(1).[16] In addition, the court exercised its *548 discretion under Evidence Code section 352, and excluded the evidence as unduly prejudicial. The court emphasized that the offer of proof concerned “only one very amorphous incident in which [Carol] left the bar with another man. For what purpose, for what reason, it is unknown.”
Defendant argues here, much as below, that the trial court abused its discretion under state law, and violated his right to present a defense and to receive both a fair trial and reliable verdict under the federal Constitution. The ruling allegedly prevented jurors from inferring that Carol, who was intoxicated, voluntarily left the bar with defendant, and engaged in consensual sexual relations with him. We disagree.
As defendant seems to concede, evidence that Carol previously left the White Oak Inn with another man had no probative value other than to suggest that she did so in order to have sex, and that she acted in a similar fashion when she left the bar with defendant. However, in addition to any prohibition that might apply under Evidence Code section 1103, subdivision (c)(1), the foregoing inference was speculative for reasons the trial court explained. The offer of proof contained no information about Carol’s conduct on prior occasions, and merely insinuated that she was a promiscuous person. “The court is not required to admit evidence that merely makes the victim of a crime look bad.” (People v. Kelly (1992) 1 Cal.4th 495, 523 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Thus, the trial court did not abuse its broad discretion in concluding that the evidence lacked probative value, and that the risk of confusion and prejudice was great. We reject defendant’s contrary claim.
4. Carol’s Intoxicated State
During Dr. Cogan’s cross-examination, the parties stipulated that, consistent with the toxicology report attached to the autopsy report, Carol had a .26 blood-alcohol level and was intoxicated. At the bench, defense counsel complained that the stipulation was inadequate absent additional evidence about Carol’s condition. Counsel wanted the jury to know, for instance, that a .08 blood-alcohol level is sufficient to commit a drunk driving offense. (See Veh. Code, §23152, subd. (b).) The trial court replied by sharing the prosecution’s relevance concerns, and by saying it might exclude such evidence if the defense proffered it.
Nonetheless, the defense subsequently moved to introduce evidence explaining Carol’s intoxicated state. First, in proceedings held largely in the *549 prosecutor’s absence, counsel sought funds to hire an expert to testify as described below. Second, in another hearing held within the prosecutor’s presence, counsel argued that such evidence was relevant and should be admitted by the court.
Fairly understood, and viewing these proceedings as a whole, defendant offered to admit expert testimony that would establish: (1) the amount of alcohol Carol consumed the night she was killed based on her height, weight, and blood-alcohol content, (2) the general effect of that blood-alcohol content in lowering a person’s sexual “inhibitions,” and (3) the general likelihood that a person whose inhibitions had been lowered in this manner would have consented to sexual relations. Defendant also sought admission of evidence that Carol’s blood-alcohol level exceeded the .08 standard needed to violate the Vehicle Code.[17]
The trial court questioned whether defendant followed the proper funds procedure in capital cases. (See § 987.9, subd. (a) [capital trial judge does not decide funds motion].) The court declined to admit the proffered evidence in any event. The court reasoned that the defense theory was speculative and irrelevant, and that the potential for jury confusion and undue prejudice was great.
Defendant claims here, as below, that the trial court abused its discretion in not allowing him to prove that Carol was intoxicated according to Vehicle Code standards, and that she therefore consented impulsively to sex. The error was allegedly prejudicial because his pretrial statements about consent were otherwise uncorroborated, and the prosecutor tried to minimize Carol’s intoxication in closing argument.[18]
The trial court properly excluded defendant’s evidence on relevance grounds. (See Evid. Code, § 210.) Nothing in the offer of proof showed how Carol’s blood-alcohol content and intoxication affected her judgment and behavior the night she was killed, or increased the chance that she did, in fact, consent to vaginal and anal intercourse. Defendant essentially wanted jurors to speculate on intoxication, inhibition, and impulse. Speculative *550 inferences are, of course, irrelevant. (People v. Kraft (2000) 23 Cal.4th 978, 1035 [99 Cal.Rptr.2d 1, 5 P.3d 68].)
The trial court also did not abuse its broad discretion to the extent it excluded the proffered evidence under Evidence Code section 352. (See People v. Rodriguez (1999) 20 Cal.4th 1, 9-10 [82 Cal.Rptr.2d 413, 971 P.2d 618] [such rulings receive great deference on appeal].) Defendant essentially sought to prove that people act under the influence of alcohol in ways they do not ordinarily behave. This is common knowledge. Hence, the proffered evidence would have had little impact on lay jurors, who presumably know as well as any expert how to assess the effect of alcohol on impulse and inhibitions. (See People v. Seaton (2001) 26 Cal.4th 598, 654-655 [110 Cal.Rptr.2d 441, 28 P.3d 175] [upholding exclusion of expert testimony on how defendant’s blood-alcohol level affected criminal intent since evidence “contained little if any information a layperson would not know”].) Nothing in the instructions prevented the jury from concluding that Carol’s intoxication caused her to consent to sexual intercourse.
Finally, defendant could not have been prejudiced by any error in excluding evidence that a .26 blood-alcohol level makes people too drunk to drive and lowers their sexual inhibitions. Carol died after a violent struggle with defendant, a virtual stranger. The condition and position of her body bore the classic signs of murder in the course of a forcible sexual assault. On the one hand, jurors knew Carol had been drinking in the bar and was intoxicated. Indeed, counsel argued that Carol was the perfect “date” because she was a promiscuous person whose resistance had been lowered by alcohol. On the other hand, the evidence also showed that defendant had recently forced another vulnerable victim to have sex, and that he likely acted with similar intent here. Defendant’s insistence that he and Carol fought violently about bar-hopping (not about sex) seemed inherently implausible, particularly in light of other patent untruths about their encounter (e.g., his denial of anal intercourse despite the presence of his semen in Carol’s anal canal). Because evidence that he murdered her during a forcible rape and sodomy was strong, the challenged ruling could not have affected the verdict.
C. Instructional Issues
1. Self-defense and Imperfect Self-defense
During a conference on jury instructions, the trial court advised counsel that it planned to instruct on both first and second degree murder in connection with the alleged murder of Carol. Defense counsel replied by requesting additional instructions on (1) the lesser offense of voluntary manslaughter based on “imperfect” self-defense (see People v. Flannel (1979) *551 25 Cal.3d 668, 674-680 [160 Cal.Rptr. 84, 603 P.2d 1]; CALJIC No. 5.17), and (2) the defense of justifiable homicide based on “perfect” self-defense. (See §§ 197, 198; CALJIC Nos. 5.12, 5.13.) For support, counsel cited defendant’s statements to police that Carol drew a knife in his car, as well as Dr. Cogan’s testimony about the cuts on Carol’s hand. Counsel theorized that Carol tried to kill defendant with the knife, that she cut her hand when he grabbed the knife, and that he strangled her in self-defense.
Finding this scenario unduly speculative, the court refused to instruct in the requested manner. Thus, as relevant here, the jury received first degree murder instructions under both premeditation and felony-murder-rape theories. The jury also received second degree murder instructions reflecting both an express and implied malice approach.
Defendant insists he offered valid theories of imperfect and perfect self-defense at trial, and that the court erred in refusing such instructions. This ruling purportedly violated his right to present a defense, to trial by jury, and to due process under the federal Constitution.
An unlawful killing involving either an intent to kill or a conscious disregard for life constitutes voluntary manslaughter, rather than murder, when the defendant acts upon an actual but unreasonable belief in the need for self-defense. (See People v. Blakeley (2000) 23 Cal.4th 82, 87-89, 91 [96 Cal.Rptr.2d 451, 999 P.2d 675]; People v. Barton (1995) 12 Cal.4th 186, 199 [47 Cal.Rptr.2d 569, 906 P.2d 531]; In re Christian S. (1994) 7 Cal.4th 768, 771, 783 [30 Cal.Rptr.2d 33, 872 P.2d 574]; People v. Flannel, supra, 25 Cal.3d 668, 679.) In addition, a homicide is justifiable and noncriminal where the actor possessed both an actual and reasonable belief in the need to defend. (People v. Barton, supra, 12 Cal.4th at pp. 199-200; People v. Flannel, supra, 25 Cal.3d at pp. 674-675.) In either case, “the fear must be of imminent harm. ‘Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant’s fear must be of imminent danger to life or great bodily injury.’ ” (People v. Humphrey (1996) 13 Cal.4th 1073, 1082 [56 Cal.Rptr.2d 142, 921 P.2d 1], quoting In re Christian S., supra, 7 Cal.4th at p. 783.) The trial court need not give such instructions on request absent substantial evidence to support them. (In re Christian S., supra, 7 Cal.4th at p. 783; see People v. Flannel, supra, 25 Cal.3d at pp. 684-685 & fn. 12.)
Applying these principles here, no error occurred. Aside from the inconsistent accounts defendant gave to police, there is no evidence Carol brought a knife to the murder scene. According to her husband and other witnesses, Carol never carried a knife when she went to the White Oak Inn. Also, the medical and physical evidence showed that Carol—the victim of lethal *552 force—struggled with her attacker and suffered defensive knife wounds. Such evidence undermines the present instructional claim by suggesting that defendant (not Carol) possessed a knife, and that Carol (not defendant) defended against its use.
Even assuming the police interview constitutes substantial evidence that Carol possessed and displayed a knife the night she was killed, there is no substantial evidence of “actual fear of an imminent harm” sufficient to support either imperfect or perfect self-defense instructions. (In re Christian S., supra, 7 Cal.4th 768, 783.) In fact, defendant’s statements affirmatively negate any such fear or belief. Defendant told police that Carol pulled the knife from her purse when a shadowy figure, perhaps her “old man,” appeared in front of the house. Defendant also reported that Carol held the knife down by her side after they had consensual sex and while they debated going to another bar. On the one hand, defendant worried about Carol’s apparent plan to “hurt somebody.” On the other hand, he maintained in the face of persistent police questioning that she showed no interest in using the knife against him, and that she did not threaten him with it in any way. This evidence shows that defendant did not perceive any imminent threat of harm from the knife.
Thus, an essential element is missing from defendant’s claim that he could not be convicted of murder because he acted either in self-defense or upon an unreasonable belief in the need to do so. The trial court did not err in refusing to instruct along such lines.
2. Reasonable and Mistaken Belief in Consent
In discussing felony-murder-rape instructions bearing on the first degree murder charge, the trial court told counsel that it would not instruct on whether defendant acted with an actual and reasonable, but mistaken, belief that Carol consented to sexual intercourse. (See People v. Williams (1992) 4 Cal.4th 354, 360-361 [14 Cal.Rptr.2d 441, 841 P.2d 961]; People v. Mayberry (1975) 15 Cal.3d 143, 153-158 [125 Cal.Rptr. 745, 542 P.2d 1337]; CALJIC No. 10.65.) According to the court, no evidence supported such a defense, and only “straight consent” could counter the prosecution’s claim that defendant forcibly raped Carol. The court cited defendant’s statements to police that Carol agreed to have vaginal sex, and that they only fought afterwards about going to another bar.
Defense counsel urged the court to change its mind and to include CALJIC No. 10.65 in its felony-murder-rape instructions. When asked to explain this request, counsel pointed to Carol’s intoxicated state. Counsel theorized that, because intoxication presumably impaired Carol’s ability to *553 communicate, defendant could have believed she consented to vaginal sex even if she did not. However, the court found no evidentiary support for this view. The court returned to its earlier theme that either defendant murdered Carol in the commission of a forcible rape, or she actually consented to vaginal intercourse and clearly communicated that fact to him.
Undaunted, defense counsel also asked for CALJIC No. 10.65 as part of the sodomy-murder special-circumstance instructions. The court said it was not prepared to discuss that matter, and that only the felony-murder-rape instructions were under review at that time. A confusing exchange then occurred in which counsel apparently agreed to save arguments concerning the special circumstance allegation until later (“Okay”), but in which the court seemed to either misstate or misunderstand counsel’s position concerning the requested instruction (“I agree with you it doesn’t apply to the rape”). In any event, consistent with its own views on the subject, the court declined to give CALJIC No. 10.65 as part of the felony-murder-rape instructions. Regarding the latter theory of first degree murder, the lone “consent” instruction the court ultimately gave was CALJIC No. 1.23.1, which speaks in terms of a sexual act freely, voluntarily, and knowingly performed. (See § 261.6.)
Defendant now asserts the trial court erred in rejecting his request for a mistake-of-fact instruction as to the forcible rape of Carol. Defendant renews his claim that Carol’s impaired state might have made it seem like she consented to vaginal sex even if she did not. The court’s decision allegedly violated defendant’s right to present a defense, to trial by jury, and to due process under the federal Constitution.[19]
The mistake-of-fact defense reflected in CALJIC No. 10.65 has two components. First, the defendant must have “honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse.” (People v. Williams, supra, 4 Cal.4th 354, 360-361, fn. omitted.) This subjective component involves evidence of “equivocal conduct” by the victim *554 that the defendant mistook for consent. (Id. at p. 361.) Second, an objective component asks whether the defendant’s mistaken belief regarding consent was “reasonable under the circumstances.” (Ibid.) In order to give such an instruction upon request, the trial court must find substantial evidence supporting each feature of the defense. (Ibid; see People v. Maury, supra, 30 Cal.4th 342, 424 [sua sponte duty to so instruct].)
Any error was harmless. The trial court ultimately granted defendant’s request for CALJIC No. 10.65 in connection with the sodomy-murder special-circumstance allegation. This instruction said that defendant would lack the requisite intent and would not be guilty of the crime of sodomy if he possessed “a reasonable and good faith belief that [Carol] voluntarily consented to engage in sodomy.” (See CALJIC No. 10.65 (1990 rev.).) Jurors unanimously found the special circumstance allegation true beyond a reasonable doubt. Hence, they necessarily rejected mistake of fact as a defense to unlawful sodomy. Because the rape and sodomy were closely connected in their commission, we conclude that, under any applicable standard, the jury would not have reached a different conclusion under CALJIC No. 10.65 as to first degree felony murder than it reached as to the felony-murder special circumstance.
On this basis, we reject the claim of reversible instructional error.
3. “Sexual Intercourse”
The standard rape instruction given here (CALJIC No. 10.00), like the rape statute itself (§ 261, subd. (a)), does not define “sexual intercourse.” Defendant claims the trial court erred in not sua sponte defining the term as vaginal penetration, and thereby violated his federal and state due process rights to a jury trial on all elements of first degree felony murder. Defendant assumes jurors mistakenly used evidence of anal penetration to find he raped Carol.
However, as defendant concedes, we have held that “sexual intercourse” has a common meaning in the context of rape, that no technical elaboration is required, and that the term can only refer to vaginal penetration or intercourse. (People v. Holt (1997) 15 Cal.4th 619, 676 [63 Cal.Rptr.2d 782, 937 P.2d 213]; cf. People v. Hughes (2002) 27 Cal.4th 287, 349-350 [116 Cal.Rptr.2d 401, 39 P.3d 432] [presuming jurors do not know legal definition of rape where court failed to instruct on rape as target offense of burglary].) Also, no risk of confusion exists where the court properly gives other instructions defining sodomy as anal penetration. (People v. Holt, supra, 15 Cal.4th at p. 676; see § 286, subd. (a); CALJIC No. 10.20.) Thus, defendant could not have been convicted of nonconsensual sexual intercourse *555 and rape based on anal penetration used to prove sodomy. We see no basis on which to distinguish or reconsider People v. Holt, supra, 15 Cal.4th 619. We therefore decline to do so.
4. Consciousness of Guilt
The trial court gave CALJIC No. 2.03, which states that the defendant’s “willfully false” statement about the charged crime may show “a consciousness of guilt,” but is “not sufficient by itself to prove guilt.” Defendant claims this instruction violated his federal and state constitutional rights (effective representation, due process, impartial jury, and reliable verdict).
However, the instruction applied based on defendant’s inconsistent and contradicted statements to police attempting to minimize involvement in the capital crime. (People v. Turner (1994) 8 Cal.4th 137, 202 [32 Cal.Rptr.2d 762, 878 P.2d 521] [instruction proper where evidence supports it].) We also have upheld CALJIC No. 2.03 against all other challenges raised here. The instructional language sufficiently protects against conviction based on the defendant’s false statements or consciousness of guilt alone. (People v. Kelly, supra, 1 Cal.4th 495, 531-532.) Nor is it argumentative or biased in the prosecution’s favor. (People v. Bacigalupo (1991) 1 Cal.4th 103, 127-128 [2 Cal.Rptr.2d 335, 820 P.2d 559].) Finally, insofar as the jury believed defendant lied about the charged crimes, the instruction did not generate an irrational inference of consciousness of guilt. (People v. Holt, supra, 15 Cal.4th 619, 678.) No error occurred.
5. Circumstantial Evidence
Defendant argues that CALJIC No. 2.01, the standard instruction on circumstantial evidence of guilt, violated his federal and state constitutional rights (due process, trial by jury, privilege against self-incrimination, and reliable verdict). He apparently faults the trial court for not deleting language barring the jury from accepting an interpretation favorable to the prosecution and unfavorable to the defense unless no other “reasonable” interpretation exists. (Ibid.) Though defendant overlooks this fact, another instruction applied the same principles to the special circumstance determination. (CALJIC No. 8.83.)
A long line of cases upholds these instructions against challenges indistinguishable from those raised here. (E.g., People v. Snow (2003) 30 Cal.4th 43, 95-96 [132 Cal.Rptr.2d 271, 65 P.3d 749]; People v. Hughes, supra, 27 Cal.4th 287, 346-347; People v. Seaton, supra, 26 Cal.4th 598, 667-668.) Consistent with these authorities, we reject defendant’s assertion that jurors divorced the circumstantial evidence instructions from other instructions *556 giving defendant the benefit of any “reasonable doubt.” In light of the reasonable doubt instructions, the circumstantial evidence instructions did not impermissibly diminish the prosecution’s burden of proof or create a mandatory presumption in favor of the prosecution’s theory of the case. Nor did anything in the challenged instructions penalize defendant for not waiving his privilege against self-incrimination and presenting a more favorable and “reasonable” account at trial. Finally, there was no instructional error for the prosecutor to exploit in this regard. He accurately described the circumstantial evidence instructions for the jury.
Defendant also contends the trial court erroneously denied his request for CALJIC No. 2.02, which applies the circumstantial evidence principles contained in CALJIC Nos. 2.01 and 8.83 to the issue of mental state, including specific intent. Under this view, the court should have at least given a modified version of CALJIC No. 2.02 that deleted the language disputed above in connection with other similar instructions. Defendant claims violations of his federal and state constitutional rights to present a defense, to a jury trial, to due process, and to a reliable verdict.[20]
The trial court followed settled law and properly concluded that the requested instruction was subsumed in other instructions. “[T]here is no need to give CALJIC No. 2.02 when the trial court gives a more inclusive instruction based upon CALJIC No. 2.01, unless the only element of the offense that rests substantially or entirely upon circumstantial evidence is that of specific intent or mental state. [Citation.] Because mental state or specific intent was not the only element of the case resting upon circumstantial evidence, the trial court did not commit error by providing only the more inclusive instructions.” (People v. Hughes, supra, 27 Cal.4th 287, 347; accord, People v. Cole (2004) 33 Cal.4th 1158, 1221-1222 [17 Cal.Rptr.3d 532, 95 P.3d 811]; People v. Marshall (1996) 13 Cal.4th 799, 849 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) Defendant presents no compelling reason to reconsider this analysis, which applies under the circumstances of the present case. We thus decline to do so.
*557 D. Alleged Prosecutorial Misconduct
Defendant contends the prosecutor made several statements during closing argument that rendered the guilt trial fundamentally unfair (thus violating his federal constitutional rights to due process and an impartial jury), and involved deceptive and reprehensible conduct (thus violating state law). (See Darden v. Wainwright (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; People v. Cole, supra, 33 Cal.4th 1158, 1202; People v. Farnam (2002) 28 Cal.4th 107, 167 [121 Cal.Rptr.2d 106, 47 P.3d 988].) Such alleged acts of misconduct, defendant urges, were prejudicial and compel reversal of the judgment. As explained below, we disagree.
1. Alleged Misstatements of the Evidence
Defendant faults the prosecutor for conflating evidence of rape bearing on first degree felony murder with evidence of sodomy used to prove the felony-murder special circumstance. Defendant cites only one example, as follows: “[/]« the autopsy report and the testimony itself, Dr. Cogan formulated the opinion of not only the rape issue . . . but also sodomy.” (Italics added.) Defendant contends this statement was false because the autopsy report mentioned only anal trauma and sodomy, not genital trauma or rape.
Defendant’s failure to object at trial bars him from challenging this comment for the first time on appeal. We agree with the Attorney General that the alleged misconduct is not so serious that a curative admonition would have been ineffective. (People v. Arias, supra, 13 Cal.4th 92, 159.)
We also reject the claim on the merits. The prosecutor did not state or imply that proof of one sex crime constituted proof of the other sex crime, or that the autopsy report alone reached any conclusions about rape as opposed to sodomy. Instead, the prosecutor reasonably suggested that Dr. Cogan’s written and testimonial opinions together showed that Carol was raped and sodomized during the lethal attack. (See People v. Farnam, supra, 28 Cal.4th 107, 169 [noting prosecutor’s wide latitude to draw reasonable inferences from evidence].) Furthermore, the prosecutor urged jurors to find rape and sodomy based on the brutalized condition of Carol’s body, the sexually suggestive position in which it was found, and the presence of defendant’s semen in both the vaginal and anal canals. The prosecutor did not misstate the evidence of sexual assault, including the contents of the autopsy report.
Defendant also claims the prosecutor misstated the evidence of Carol’s intoxication. The relevant facts are as follows: Arguing that the prosecution did not prove lack of consent to either vaginal or anal intercourse, defense counsel portrayed Carol as a promiscuous woman who, though married, *558 drank heavily and sought “male attention” in bars. Counsel theorized that Carol’s intoxication caused her to consent to sex and to provoke a fight out of anger or shame. In rebuttal, the prosecutor urged jurors not to blame the victim. He first asked the rhetorical question whether “somebody who has a drink or two gets to be raped and sodomized and killed?” (Italics added.) Then, in describing Carol as a loving wife and mother who fought to save her life, the prosecutor said she was “under the influence a little’'’ when she died. (Italics added.) Defense counsel successfully objected and sought an admonition, as discussed below.
Defendant contends the prosecutor falsely portrayed Carol as only mildly impaired, citing both comments italicized above. Assuming the claim has been preserved for appeal, we conclude that, under any applicable standard, the jury could not have “construed or applied the prosecutor’s remarks in an objectionable fashion.” (People v. Arias, supra, 13 Cal.4th 92, 163.) The prosecutor prefaced the first challenged remark with a reminder that Carol had a .26 blood-alcohol reading and was intoxicated. Similarly, in sustaining defense counsel’s objection to the second challenged remark, the trial court made clear that Carol was “under the influence, period.” The prosecutor agreed, reminding jurors that the parties had stipulated to Carol’s intoxication. Finally, the instructions advised jurors that any stipulated fact was deemed conclusively proved, and that statements by the attorneys were not evidence. Under the circumstances, no prejudicial misconduct on victim intoxication occurred.
2. Alleged Misstatements of Law
Defendant insists the prosecutor repeatedly mischaracterized the crime of first degree premeditated murder, as follows: The prosecutor initially suggested that defendant could be convicted of first degree premeditated murder if he acted with “intent to kill” and to eliminate Carol as a witness to her own sexual assault. The trial court called both attorneys to the bench and ordered the prosecutor to clarify that he needed to prove premeditation and deliberation in addition to intent to kill. Later, the prosecutor said “all I have to [prove is]” that defendant “inten[ded] to kill” Carol in order to cover up the rape and sodomy. The defense objected and sought a curative admonition. As a result, both the court and the prosecutor reminded jurors that first degree premeditated murder required premeditation and deliberation as well as intent to kill. In keeping with this theme, the prosecutor argued that even if the sexual attack on Carol were opportunistic, defendant had decided to kill her by the time the struggle began in his car.
Defendant now claims the prosecutor misstated the law by excising premeditation and deliberation from first degree premeditated murder. (See *559 People v. Hill (1998) 17 Cal.4th 800, 830-831 [72 Cal.Rptr.2d 656, 952 P.2d 673] [prosecutor overlooked force or fear element of robbery].) Assuming the claim has been preserved for appeal, the jury could not have been misled as defendant suggests. The trial court took swift action to correct any suggestion that first degree premeditated murder involved no mental state other than intent to kill. The instructions also identified and defined the elements of first degree premeditated murder, including the prosecution’s duty to prove the “willful, deliberate and premeditated” nature of the killing. As noted earlier, the jury knew statements made in closing arguments had no binding effect. The instructions also told jurors to “follow the law” as stated by the court. We assume the jury abided by the court’s admonitions and instructions, and thereby avoided any prejudice. (People v. Jones (1997) 15 Cal.4th 119, 168 [61 Cal.Rptr.2d 386, 931 P.2d 960].)
3. Reference to Penalty
In his rebuttal argument, the prosecutor urged jurors not to accept defense counsel’s view of the evidence or to return a second degree murder verdict. The prosecutor theorized that counsel wanted to avoid both a “penalty phase” and any “special circumstance issue.” Counsel objected and requested a bench conference. Anticipating counsel’s concerns, the trial court struck the quoted language from the record. The court also told the jury not to consider “any issue of penalty phase whatsoever.” The prosecutor agreed, explaining to the jury that only guilt was then under review.
Contrary to what defendant now claims, no prejudice occurred. The challenged reference was brief, fleeting, and mild. (See People v. Kipp (2001) 26 Cal.4th 1100, 1130 [113 Cal.Rptr.2d 27, 33 P.3d 450].) The trial court told jurors to ignore the remark as soon as it was made. They received another warning against considering penalty shortly before guilt deliberations began. We can only assume jurors properly performed their duty and followed their instructions in this regard.
4. Alleged Attacks on Counsel
Defendant contends the prosecutor repeatedly disparaged defense counsel in rebuttal argument. The prosecutor told jurors to avoid “falling]” for counsel’s argument in favor of a second degree murder verdict, to view counsel’s argument as a “ridiculous” attempt to allow defendant to “walk” free, to view counsel’s statement as an “outrageous” attempt to demean the victim and treat her as a “Jane Doe,” and to view counsel’s argument as a “legal smoke screen.”[21]
*560 No misconduct occurred. This case does not involve such forbidden prosecutorial tactics as falsely accusing counsel of fabricating a defense or otherwise deceiving the jury. (People v. Bemore (2000) 22 Cal.4th 809, 846 [94 Cal.Rptr.2d 840, 996 P.2d 1152].) The prosecutor simply used colorful language to permissibly criticize counsel’s tactical approach. (Ibid.; see People v. Marquez (1992) 1 Cal.4th 553, 575-576 [3 Cal.Rptr.2d 710, 822 P.2d 418] [upholding reference to defense as “smokescreen”].) These comments were explicitly aimed at counsel’s closing argument and statement, rather than at him personally. We see no improper attack on counsel’s integrity.
E. Cumulative Error
Defendant argues that the cumulative effect of all guilt phase errors rendered the trial fundamentally unfair. However, we either have rejected his claims and/or found any assumed error to be nonprejudicial on an individual basis. Viewed as a whole, such errors do not warrant reversal of the judgment.
V. Penalty Phase Issues
A. Defendant’s Forcible Sodomy of His Daughters
1. Background
A week or so before the cause was called to trial on July 7, 1992, the prosecution advised the defense both orally and in writing about witnesses who might describe criminal activity involving defendant’s use or threatened use of violence under section 190.3, factor (b) (factor (b)). The list included defendant’s daughter, S., and his ex-wife, Deborah. The prosecutor also disclosed his ongoing investigation of a 1981 arrest in Texas for sexual assault. The search had been hampered, he said, by the lack of any record of conviction and the difficulty obtaining interstate police reports. While he did not know who accused defendant of the Texas crimes, the prosecutor promised to “immediately” disclose that information if it involved “the daughters or someone I believe I can use at the penalty phase.”
*561 On July 17, 1992, the day after the jury was sworn, the prosecutor told both the court and counsel that he had just received police records faxed from Texas confirming that defendant’s 1981 arrest involved rape and/or sodomy against both daughters. The prosecutor said that he had not yet located either victim. Nonetheless, he gave notice of his intent to introduce their testimony about violent sex crimes prompting the 1981 arrest. The prosecutor gave the defense copies of the faxed material.
Counsel responded by accusing the prosecutor of delay in disclosing the circumstances of the Texas sex crimes. Counsel sought exclusion of this evidence under both section 190.3 and due process principles, because adequate notice was not given until after trial had begun. However, the motion failed. The court determined that the prosecution had acted diligently and fulfilled all notice requirements. Finding no unfair surprise, the court cited preliminary hearing testimony in which Valery C. said that S. had mentioned being sexually abused by defendant.
Shortly before the penalty phase, the court considered the admissibility of the Texas sex crimes on grounds other than notice. The prosecutor said he had not yet located S., and that only M. and Deborah might testify at trial. He called both witnesses at the hearing as part of his offer of proof. (See Evid. Code, § 402.)
Specifically, M. testified that defendant threatened, frightened, and sodomized both her and S. as children in Texas. According to M., the abuse of both girls began when M. was five and ended when she was eight, and occurred once or twice a week when their mother was not home. Deborah testified, in turn, that M. told her and others about the abuse. The parties stipulated that these accusations led to defendant’s 1981 arrest, and ended in a “no bill” grand jury proceeding in Texas. It was further established by stipulation and judicial notice that such a proceeding occurs when an insufficient number of grand jurors (i.e., fewer than nine of 12) find probable cause of a crime, and means the suspect is not indicted or held for trial. Also, the grand jury may reconsider the case and issue an indictment later.
The defense moved to exclude the Texas sex crimes on two grounds. First, defendant claimed he had been acquitted by the grand jury, and that the evidence was thus barred under factor (b). Second, defendant insisted the acts were stale and prejudicial under Evidence Code section 352. He argued their admission would be abusive and unfair.
These claims were rejected. The trial court declined to view the Texas grand jury’s failure to indict as a “final adjudication on the merits.” The court also refused to exclude the Texas sex crimes under Evidence Code section *562 352. However, defendant was allowed to tell penalty jurors about the favorable outcome of the Texas case.
As noted, M. and Deborah testified at the penalty phase consistent with their accounts at the evidentiary hearing. The defense established that the Texas grand jury did not indict defendant for sodomy against M. and S. An instruction prevented penalty jurors from considering any violent criminal acts in aggravation under factor (b) unless they were proven beyond a reasonable doubt.
On appeal, defendant contends use of the factor (b) sex crimes violated state statutory law in several respects, and impaired his federal and state constitutional rights to due process and a reliable verdict. We now address each claim.[22]
2. Notice Requirements
Defendant argues here, as below, that the trial court should have excluded the factor (b) sex crimes because the prosecution did not timely disclose certain details before trial, like the victims’ identities. We disagree.
The defense generally must receive notice of aggravating evidence “prior to trial.” (§ 190.3.) Depending upon the circumstances, we have defined this concept to mean either before the case is called to trial (People v. Daniels (1991) 52 Cal.3d 815, 879 [277 Cal.Rptr. 122, 802 P.2d 906]) or before the start of jury selection. (People v. Johnson (1993) 6 Cal.4th 1, 51 [23 Cal.Rptr.2d 593, 859 P.2d 673].) In any event, notice given later in time does not require exclusion of the evidence where it is newly discovered, and the delay is not unreasonable, unexcused, or prejudicial. (People v. Smith (2003) 30 Cal.4th 581, 619 [134 Cal.Rptr.2d 1, 68 P.3d 302].) At no point must the section 190.3 notice recite every circumstantial fact surrounding a factor (b) crime. The purpose of the statute is met where the defendant has a reasonable chance to defend against the charge. (People v. Arias, supra, 13 Cal.4th 92, 166; People v. Pride, supra, 3 Cal.4th 195, 258.)
The trial court properly applied these rules here. The prosecution informed the defense well before trial that at least one daughter, S., would describe factor (b) crimes—crimes that logically included the incest S. had revealed to *563 Valery C. At the same time, the prosecution disclosed that the factor (b) evidence might include sex crimes underlying defendant’s 1981 Texas arrest, and that his two daughters might be the victims. While the prosecutor did not confirm the latter fact until after the jury was sworn, he shared such information as soon as it arrived from out of state. Only a few weeks passed between the first and second notifications. Even the latter notice came near the start of trial, before any guilt evidence was introduced. Thus, defendant was adequately apprised of the prosecution’s intent to admit evidence of the sodomy involving his daughters.
3. Acquittal Defense
Defendant contends he was “prosecuted and acquitted” for the factor (b) sex crimes in Texas, and that such acts were therefore barred under section 190.3. According to this theory, the grand jury’s failure to indict defendant under a probable cause standard constituted an implied determination that he was not guilty beyond a reasonable doubt. Defendant is mistaken.
Section 190.3 expressly permits proof of any violent criminal activity, whether or not it led to prosecution and conviction, except as to any offense resulting in an acquittal. (People v. Melton, supra, 44 Cal.3d 713, 754.) We have strictly limited this statutory notion of an acquittal to a judicial determination on the merits of the truth or falsity of the charge. (People v. Bacigalupo, supra, 1 Cal.4th 103, 133-134; People v. Jennings (1991) 53 Cal.3d 334, 390 [279 Cal.Rptr. 780, 807 P.2d 1009].) Thus, an acquittal after prosecution does not occur for purposes of section 190.3 where the trial court dismissed the case under section 995 for lack of probable cause as to guilt. (People v. Ghent (1987) 43 Cal.3d 739, 774 [239 Cal.Rptr. 82, 739 P.2d 1250].) We have reached the same result even where a statutory bar prevents refiling of the dismissed charge. (People v. Medina (1990) 51 Cal.3d 870, 907 [274 Cal.Rptr. 849, 799 P.2d 1282].)
Here, there was no judicial determination on the merits as to whether defendant forcibly sodomized his daughters. The Texas proceeding involved a discretionary charging decision by the grand jury. Indeed, it seems even further removed from an “acquittal” than a section 995 proceeding in which pending criminal charges are dismissed by a judge. Nothing in the grand jury proceeding itself prevented defendant from being later charged, prosecuted, and convicted of the same crimes. None of the features commonly associated with acquittals exist here. (Cf. People v. Hatch (2000) 22 Cal.4th 260, 271 [92 Cal.Rptr.2d 80, 991 P.2d 165] [double jeopardy principlés bar retrial if court finds evidence at trial was insufficient to support conviction as matter of law].) The trial court properly reached the same result.
*564 4. Evidence Code Section 352
According to defendant, Evidence Code section 352 virtually compelled exclusion of the factor (b) sex crimes because they were too remote and prejudicial, and because M.’s testimony was untrustworthy. However, the trial court did not abuse its discretion in this regard.
The prosecution may offer, in aggravation, violent criminal acts committed at any time in the defendant’s life. (People v. Rodrigues (1994) 8 Cal.4th 1060, 1158 [36 Cal.Rptr.2d 235, 885 P.2d 1]; People v. Bacigalupo, supra, 1 Cal.4th 103, 134.) The time gap between the forced serial sodomy of defendant’s daughters and the present trial is not unusually long by capital standards. (E.g., People v. Anderson (2001) 25 Cal.4th 543, 585 [106 Cal.Rptr.2d 575, 22 P.3d 347], and cases cited.) Also, because factor (b) expressly permits admission of criminal violence at the penalty phase, the trial court cannot exclude all such evidence as unduly prejudicial. (Anderson, supra, at p. 586.) This information shows the defendant’s propensity for violence, and helps jurors decide whether he deserves to die. (People v. Ray (1996) 13 Cal.4th 313, 349-350 [52 Cal.Rptr.2d 296, 914 P.2d 846].) As for M.’s credibility, this issue affects the weight, not the admissibility, of her factor (b) testimony. It was for the jury to decide, based on proper instruction, whether she properly recalled and recounted defendant’s violent acts. (People v. Catlin, supra, 26 Cal.4th 81, 172; People v. Anderson, supra, 25 Cal.4th at p. 587.)
B. Photograph of Carol While Alive
Near the start of the penalty trial, the court and counsel repeatedly discussed the admissibility in the prosecution’s case-in-chief of two photographs of Carol while she was alive. One depicted Carol and her husband Delbert together, and the other depicted Carol with several family members. The prosecution offered the pictures as victim impact evidence under Payne v. Tennessee (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597] (Payne), and its progeny. The defense opposed admission of the photographs on these grounds. Counsel argued that the photos were irrelevant and prejudicial because they were taken at unknown times, and because they did not show the kind of harm contemplated by the cases on which the prosecution relied.
The trial court excluded the group family photo, but admitted the photo of Carol and Delbert, marking it exhibit No. 85. The prosecution introduced the latter item while Delbert was on the witness stand. In the process, the prosecution asked one substantive question, “How did you feel about your wife?” As noted, Delbert said she was his “whole life.”
*565 Defendant argues here, much as below, that exhibit No. 85 was irrelevant. Its admission purportedly violated his right to due process under the federal and state Constitutions, and his right to a reliable verdict under the federal Constitution. We disagree.[23]
In 1987, the United States Supreme Court held that the Eighth Amendment barred evidence of a murder victim’s personal traits and the effect of the murder on surviving relatives. (Booth v. Maryland (1987) 482 U.S. 496, 509 [96 L.Ed.2d 440, 107 S.Ct. 2529] (Booth); see South Carolina v. Gathers (1989) 490 U.S. 805, 811-812 [104 L.Ed.2d 876, 109 S.Ct. 2207] [barring prosecutorial argument on the matter].) Four years later, in Payne, supra, 501 U.S. 808, the high court reversed itself, and held that the states could choose to admit evidence of the “specific harm” the defendant had caused, to wit, the loss to society and the victim’s family of a “unique” individual. (Id. at p. 825.) According to Payne, the federal Constitution bars such evidence only if it is “so unduly prejudicial” as to render the particular trial “fundamentally unfair.” (Ibid.)
Shortly after Payne, this court held that victim impact evidence is generally admissible as a circumstance of the crime under section 190.3, factor (a). (People v. Edwards (1991) 54 Cal.3d 787, 835-836 [1 Cal.Rptr.2d 696, 819 P.2d 436].) Payne and Edwards apply even where, as here, the murder occurred while Booth, supra, 482 U.S. 496, was in effect. (People v. Brown (2004) 33 Cal.4th 382, 394-395 [15 Cal.Rptr.3d 624, 93 P.3d 244].)
The challenged photograph helped illustrate Delbert’s expression of love for Carol—testimony that defendant does not contest. As a whole, such evidence implied that Carol’s loved ones suffered grief and pain over her loss. Thus, the jury could consider this evidence in determining whether death or LWOP was the appropriate punishment. (E.g., People v. Boyette (2002) 29 Cal.4th 381, 444 [127 Cal.Rptr.2d 544, 58 P.3d 391] [allowing photos of murder victims taken at unspecified times].) Contrary to what defendant implies, the photograph was not irrelevant or unduly prejudicial simply because it did not depict Carol exactly as she appeared to defendant, or because he knew nothing about her marriage. (People v. Pollock (2004) 32 Cal.4th 1153, 1183 [13 Cal.Rptr.3d 34, 89 P.3d 353] [rejecting claim that victim impact evidence involves “only circumstances known or reasonably foreseeable to the defendant at the time of the crime”].) No error occurred.
*566 C. Carol’s Intoxicated State
Before opening statements at the penalty phase, the defense moved to explore the issue of Carol’s intoxication—a request the trial court had denied at the guilt phase. Once again, counsel sought to present both argument and evidence, including expert testimony, concerning die .08 blood-alcohol standard used for drunk driving (see Veh. Code, § 23152, subd. (b)), and the general effect of a .26 blood-alcohol level on sexual consent. Defendant claimed such evidence would rebut any victim impact testimony that Carol was an ideal wife, and would raise lingering doubt as to his guilt of forcible rape and sodomy.
Ruling on the issue, the trial court allowed defendant to tell jurors that Carol was “highly intoxicated” when she left the bar with him. Also, if the prosecution idealized Carol, the court promised to allow appropriate rebuttal, apparently about her drinking and socializing in bars. However, alluding to its guilt phase ruling, the court otherwise denied defendant’s motion on relevance grounds. The court found nothing in the offer of proof linking Carol’s blood-alcohol content and intoxication to her own sexual behavior. Later, before closing arguments, the court denied another defense request to mention the .08 blood-alcohol standard contained in the Vehicle Code.
Here, much as below, defendant maintains that evidence offered to explain Carol’s intoxication was relevant and admissible for reasons given at the guilt phase, and that the trial court continued to err insofar as it excluded such evidence at the penalty phase. The argument in favor of admission is purportedly stronger at the penalty phase, because of defendant’s federal constitutional right to present relevant mitigating evidence in the form of lingering doubt as to his guilt of the capital crime. Defendant claims prejudice insofar as the prosecution argued that Carol’s intoxication did not cause her to consent to vaginal or anal sex with him.
Defendant’s claim fails at the threshold. A capital defendant has no federal constitutional right to have the jury consider lingering doubt in choosing the appropriate penalty. “Such lingering doubts are not over any aspect of [a defendant’s] ‘character,’ ‘record,’ or a ‘circumstance of the offense.’ ” (Franklin v. Lynaugh (1988) 487 U.S, 164, 174 [101 L.Ed.2d 155, 108 S.Ct. 2320], quoting Eddings v. Oklahoma (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 102 S.Ct. 869]; accord, People v. Cox (1991) 53 Cal.3d 618, 676 [280 Cal.Rptr. 692, 809 P.2d 351].) In any event, nothing the high court has said about the constitutional significance of mitigation makes such evidence more relevant, competent, and admissible at the penalty phase than it is at the guilt phase. Evidence that is inadmissible to raise reasonable doubt at the guilt phase is inadmissible to raise lingering doubt at the penalty phase. (See *567 McKoy v. North Carolina (1990) 494 U.S. 433, 440 [108 L.Ed.2d 369, 110 S.Ct. 1227] [same test of relevance applies to mitigation at penalty phase as in any other context]; People v. Coffman and Marlow (2004) 34 Cal.4th 1, 116 [17 Cal.Rptr.3d 710, 96 P.3d 30] [trial court retains discretion at penalty phase to exclude proffered mitigation as irrelevant or unduly prejudicial].)
Defendant’s evidence of victim intoxication at the penalty phase suffered from the same logical gaps that justified its exclusion at the guilt phase. Nothing showed that Carol’s blood-alcohol content and intoxication affected her willingness to consent to sex. In seeking to create or reinforce lingering doubt, the defense simply wanted jurors to assume that because Carol’s .26 blood-alcohol content far exceeded the statutory limit for drunk driving, she must have consented to sexual relations with defendant. Such speculative inferences would have added nothing to what jurors presumably knew. No abuse of discretion occurred.
Even so, defendant could not have been prejudiced. The penalty evidence showed that defendant threatened and sodomized his daughters while they were quite young. The abuse lasted several years, and defendant repeatedly ignored the victims’ cries of pain. More recently, defendant choked and raped Valery C.—one of the convictions entered in the present case. At the time, Valery was a pregnant teenager who had moved into defendant’s home, and who had never been alone with him before. Again, defendant refused the victim’s pleas to stop. Finally, with respect to the capital crime, the evidence showed that defendant brutally raped, sodomized, and murdered Carol. Carol apparently died struggling to save her own life, and likely experienced great pain. The crime occurred as soon as defendant—who perceived Carol as drunk—got her alone in his car. Thus, in choosing the appropriate punishment, jurors knew that defendant had a long history of sexually assaulting females who were vulnerable or in his care, and that his crimes had escalated in violence. The admission of evidence either comparing Carol’s blood-alcohol level to the drunk driving standard or exploring the general effect of intoxication on sexual impulse could not have produced a more favorable sentence under any applicable standard.
D. Alleged Prosecutorial Misconduct
Defendant contends that prosecutorial misconduct occurred throughout the penalty trial in violation of his federal constitutional rights to due process and an impartial jury. He presents these alleged improprieties in the order they occurred at trial, providing a brief analysis of each one. We first categorize, and then reject, these claims.
*568 1. Alleged Inflammatory Remarks
Defendant insists the prosecutor prejudiced the jury against him in the following ways: (1) referring in opening statements to the aggravating evidence as “shocking,” “vicious,” and “unspeakable,” (2) asking M. on direct examination to describe defendant’s “bad” acts even though they might be “difficult” to discuss, and (3) suggesting in closing argument that defense counsel should not have cross-examined M. about the “tissues” she used to clean herself after being sodomized as a child.
Defendant objected successfully to the foregoing remarks. However, he failed to request a curative admonition below, and offers no excuse for not doing so on appeal. We agree with the Attorney General that the claims are barred. (People v. Hill, supra, 17 Cal.4th 800, 820.) Nevertheless, we see no harm even assuming some misconduct, occurred. None of the incidents seemed so serious or inflammatory that they would prevent jurors from following their instructions and ignoring material as to which an objection had been sustained. (People v. Padilla, supra, 11 Cal.4th 891, 956-957.)
Defendant also claims the prosecutor improperly referred in closing argument to Carol and Valery C. as innocent victims who suffered pain and degradation at defendant’s hands. The prosecutor observed that, at the time of the crimes, Carol was a wife and mother, and Valery was a pregnant and homeless teenager.
First, defendant failed to object at trial. We therefore agree with the Attorney General that defendant has forfeited the present claim. (People v. Cole, supra, 33 Cal.4th 1158, 1233.)
Second, the challenged remarks constituted permissible victim impact argument under Payne, supra, 501 U.S. 808, 825. As noted earlier, the prosecutor was free to ask penalty jurors to consider any special traits that made the victims vulnerable to attack, and the unique pain that either the victims or their families experienced as a result of the charged crimes. The record supports the prosecutor’s arguments. The trial was not fundamentally unfair in this regard. (E.g., People v. Cole, supra, 33 Cal.4th 1158, 1233-1234 [allowing argument about physical pain defendant inflicted on victim during surprise attack]; People v. Boyette, supra, 29 Cal.4th 381, 444 [allowing argument about emotional grief and loss experienced by victims’ families].)
*569 2. Alleged Disregard of Evidentiary Rulings
Twice during his examination of M., the prosecutor asked about events not disclosed during the in limine hearing concerning evidence of the factor (b) crimes. One question asked whether M. had “tried to interrupt” a fight between her mother and defendant, and the other question asked if she had heard a “taped message” between defendant and her mother in the months before trial. When the defense objected to the first question, the court summoned counsel to the bench to discuss the matter. However, as soon as the second question was asked, the court called a conference without any prompting from the defense. Counsel then objected at the bench. Each time, the court reprimanded the prosecutor for trying to admit aggravating evidence not included in his offer of proof. During the second hearing, the court threatened to admonish the prosecutor in front of the jury or to grant a mistrial if the problem recurred.
Defendant maintains the prosecutor improperly tried to elicit inadmissible evidence in violation of a court ruling. (People v. Silva (2001) 25 Cal.4th 345, 373 [106 Cal.Rptr.2d 93, 21 P.3d 769].) It appears the claim has been preserved for appeal even though no request for an admonition was made at trial. The court made clear after sustaining the second defense objection that it was not prepared to take any other curative action at that time. (People v. Hill, supra, 17 Cal.4th 800, 820-821.) But, any impropriety was not so egregious as to render the trial unfair or to prejudice defendant. (People v. Silva, supra, 25 Cal.4th at p. 373.) The disputed questions involved events that were extremely minor compared to the sodomy murder of Carol, the rape of Valery C., and the forced serial sodomy of defendant’s daughters. The court also intervened before M. could give any damaging details. We reject the claim.
3. Alleged Misstatements of the Evidence
In closing argument, the prosecutor reminded jurors not to allow personal feelings about capital punishment to interfere improperly with their oath and the court’s instructions. To illustrate such bias, the prosecutor referred to defendant’s ex-wife Deborah, who testified that she opposed death for defendant or anyone else in his situation. The specific comment was that if Deborah had undergone voir dire, “she would have been excused for cause.” The trial court overruled counsel’s timely objection—an objection that the *570 Attorney General reasonably suggests was sufficient to preserve the claim for appeal. (See People v. Hill, supra, 17 Cal.4th 800, 820-821.)
Defendant now contends the challenged remark was unfounded and incorrect. However, even assuming the prosecutor misspoke for the reasons defendant suggests, jurors were merely being asked to perform their lawful sentencing function. Defendant could not have been prejudiced as a result.
Defendant next argues that the prosecutor incorrectly summarized the facts concerning defendant’s sodomy of his daughters. First, the prosecutor said that defendant began sodomizing S. when she was “three years old.” Second, the prosecutor said that “each” girl was sodomized “twice weekly” for “[tjhree and a half years.” Defendant suggests that even though these comments mirrored M.’s testimony at the in limine hearing, they found no support in her trial testimony, which was less specific in this regard.
Preliminarily, the trial court overruled two defense objections to the first comment and told the prosecutor to continue with his argument. As the Attorney General seems to concede, defendant’s failure to request an admonition does not forfeit the claim, because the request would probably have been denied. (People v. Hill, supra, 17 Cal.4th 800, 820-821.) However, defendant failed to object to the second comment. We agree with the Attorney General that it cannot be challenged for the first time here. (Id. at p. 820.)
On the merits, the challenged comments do not warrant reversal of the judgment. First, as to when the molestation of S. began, M. testified at trial that defendant started molesting her (M.) at age five, and that the abuse lasted three and one-half years, ending when she was eight years old. M. also testified that during the same three and one-half year period, S. was “typically” or “normally” sodomized on the same occasions as M. (M. also saw S. being abused more than once.) Hence, the evidence does not foreclose the inference that defendant started molesting S. at the same time he started molesting M. Since S. was two years younger than M., defendant’s sodomy of S. could have begun when she was three years old. No factual misstatement occurred.
As to the second comment about the frequency of these acts, M. testified at trial that they usually happened on Saturdays when her mother ran errands with R. M. also described a typical encounter as one in which defendant first sodomized M. and then sodomized S. Even assuming this testimony did not *571 support the prosecutor’s twice-weekly estimate as to each girl, we see no harm. M. indicated that defendant regularly and brutally sodomized both daughters for several years while they were young and vulnerable.
Defendant further contends no evidence supported the prosecutor’s assertion in closing argument that defendant might commit sodomy in prison if sentenced to LWOP. (See People v. Millwee (1998) 18 Cal.4th 96, 153 [74 Cal.Rptr.2d 418, 954 P.2d 990] [argument on future dangerousness proper where based on evidence of past crimes].) However, even where a capital defendant has shown a preference for sexual violence against women, it is not improper to suggest that he might prey on inmates and/or prison staff. (People v. Welch, supra, 20 Cal.4th 701, 761; People v. Bradford, supra, 15 Cal.4th 1229, 1380.) In any event, the trial court sustained defense counsel’s objection and told jurors to disregard the reference to future sodomy. We can only assume they followed the instruction, and did not allow this isolated remark to affect the verdict.
4. Alleged Misstatements About Sentencing Discretion
In closing argument, the prosecutor emphasized the standard instruction on sentencing discretion (CALJIC No. 8.88 (1989 rev.)), and used a chart of that instruction as a visual aid. He said that if jurors decided that aggravation substantially outweighed mitigation, then “it’s your responsibility, duty and obligation pursuant to your oath, if you think it’s warranted,” to impose the death penalty. He later made similar remarks about death as the “appropriate” penalty. The prosecutor also described the aggravating and mitigating factors in detail (see § 190.3, factors (a)-(k)), including defendant’s character and background evidence. (Id., factor (k).)
Defendant seems to contend that the prosecutor mischaracterized death as automatic, mandatory, or nondiscretionary in the present case. As defendant suggests, jurors are “free to reject death [based on] any constitutionally relevant evidence or observation that it is not the appropriate penalty.” (People v. Brown (1985) 40 Cal.3d 512, 540 [230 Cal.Rptr. 834, 726 P.2d 516], fn. & italics omitted, revd. on other grounds sub nom. California v. Brown (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].) The law also does not “require any juror to vote for the death penalty unless, upon *572 completion of the [individual and normative] ‘weighing’ process, he decides that death is the appropriate penalty under all the circumstances.” (Brown, supra, 40 Cal.3d at p. 541.)
First, we agree with the Attorney General that because defendant failed to raise any objection at trial, he has forfeited the present claim. (See People v. Davenport (1995) 11 Cal.4th 1171, 1221 [47 Cal.Rptr.2d 800, 906 P.2d 1068].)
Second, no misconduct occurred. Consistent with applicable law and the court’s instructions, the prosecutor made clear that in order to return a death verdict, jurors must determine that aggravation substantially outweighed mitigation, and that death was the appropriate penalty. Indeed, the prosecutor tempered his “duty” reference by urging jurors to choose death only “if [they] think it’s warranted.” Consistent with the court’s instructions, prosecutorial argument clearly and correctly implied that sentencing involved a normative weighing process, and that all relevant mitigation should be considered. Nothing indicated that jurors lacked discretion in the manner defendant suggests.[24]
E. Cumulative Error
Defendant complains about the cumulative effect of alleged constitutional defects at his penalty trial, including prosecutorial misconduct. We have individually rejected his claims of error and/or found any assumed error to be nonprejudicial. Such errors are no more compelling or prejudicial when considered together. We decline to reverse the death judgment on this ground.
F. Constitutionality of the Death Penalty Law
Defendant contends that, in many respects, the 1978 death penalty law under which he was sentenced denied him a fair and reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and under parallel provisions of the California Constitution. As defendant concedes, we have rejected these claims before. We do so again here.
*573 1. Death Eligibility
The homicide and death penalty statutes adequately narrow the class of first degree murderers eligible for the death penalty. The scheme is not overbroad because it permits capital exposure for many first degree murders (People v. Crittenden, supra, 9 Cal.4th 83, 154-155), including unintentional felony murder. (People v. Anderson, supra, 25 Cal.4th 543, 601.) Nor are the special circumstances overinclusive in number or scope. (People v. Ray, supra, 13 Cal.4th 313, 356.) Prosecutorial discretion to invoke the death penalty law does not render its application unconstitutional. (People v. Maury, supra, 30 Cal.4th 342, 438.) The prosecutor has not been delegated the judicial sentencing function in violation of separation of powers principles. (People v. Bemore, supra, 22 Cal.4th 809, 858.) Defendant has not shown on this record or through any judicially noticeable means that his contrary claims are empirically accurate and legally meritorious. (People v. Michaels, supra, 28 Cal.4th 486, 541.)
2. Core Adjudicative Principles
The trial court did not err in failing to modify the standard capital sentencing instructions by requiring the jury to (1) find proof of aggravating factors (in addition to other violent crimes) beyond a reasonable doubt, (2) find that aggravation outweighs mitigation beyond a reasonable doubt, (3) find that death is the appropriate penalty beyond a reasonable doubt, (4) reach unanimity as to the aggravating factors, and (5) presume that LWOP is the appropriate sentence. (People v. Jones, supra, 15 Cal.4th 119, 196; People v. Arias, supra, 13 Cal.4th 92, 190.) Contrary to what defendant implies, the death penalty scheme does not violate either constitutional or statutory law insofar as it fails to allocate a burden of proof, or establish a standard of proof, for finding aggravating and mitigating circumstances and for selecting the appropriate penalty. (People v. Welch, supra, 20 Cal.4th 701, 767-768.) Recent high court decisions, such as Blakely v. Washington (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], Ring v. Arizona (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and Apprendi v. New Jersey (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], do not require reconsideration or modification of our long-standing conclusions in this regard. (People v. Morrison (2004) 34 Cal.4th 698, 731 [21 Cal.Rptr.3d 682, 101 P.3d 568]; People v. Prieto (2003) 30 Cal.4th 226, 262-263, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)
*574 3. Death Selection
The sentencing factors contained in section 190.3, particularly factor (a) (circumstances of the capital crime) and factor (b) (other violent criminal activity), are not impermissibly vague. (Tuilaepa v. California (1994) 512 U.S. 967, 975-980 [129 L.Ed.2d 750, 114 S.Ct. 2630], affg. People v. Tuilaepa, supra, 4 Cal.4th 569, 594-595.) These factors also did not bias the jury in favor of death insofar as they allowed evidence of guilt to be used as evidence in aggravation. (People v. Ray, supra, 13 Cal.4th 313, 358.) In addition, the trial court did not err in failing to (1) delete assertedly inapplicable sentencing factors, (2) instruct as to which sentencing factors are aggravating and which are mitigating, (3) instruct that the absence of mitigation in certain statutory categories was not aggravating, and (4) instruct on the definition of mitigation. (People v. Hughes, supra, 27 Cal.4th 287, 404.) The standard instructions in CALJIC No. 8.88 (1989 rev.) adequately advised jurors on the scope of their discretion to reject death and to return an LWOP verdict. (People v. Rodrigues, supra, 8 Cal.4th 1060, 1192; People v. Duncan (1991) 53 Cal.3d 955, 978-979 [281 Cal.Rptr. 273, 810 P.2d 131].) The trial court did not prevent meaningful appellate review by failing to require a written statement of the jury’s findings and reasons for imposing a death sentence. (People v. Davenport, supra, 11 Cal.4th 1171, 1232.) No instruction on the meaning of LWOP was required. (People v. Holt, supra, 15 Cal.4th 619, 688-689.)
4. Appellate Review
California’s automatic appeals process is constitutional even though it affords no intercase proportionality review. (People v. Anderson, supra, 25 Cal.4th 543, 602; see Pulley v. Harris (1984) 465 U.S. 37, 50-51 [79 L.Ed.2d 29, 104 S.Ct. 871].) Although his death sentence is theoretically subject to intracase proportionality review (People v. Anderson, supra, 25 Cal.4th at p. 602), defendant apparently raises no such claim. His sentence is not grossly disproportionate to his moral culpability in any event. In addition, the appellate review process is not impermissibly influenced by political considerations in capital cases. (People v. Kipp, supra, 26 Cal.4th 1100, 1140-1141.)
G. Determinate Sentencing
After denying the automatic motion to modify the death verdict and pronouncing judgment on the capital count (§ 190.4, subd. (e)), the trial court imposed a determinate sentence on the noncapital count. (See § 1170, et seq.) *575 Consistent with the probation report, which it read solely for noncapital sentencing purposes, the court chose the upper term of eight years for the rape of Valery C. (See § 264, subd. (a).) The prison term was then made consecutive to the death sentence. As explained further below, the court relied on “both the youth and vulnerability of the victim” in making these decisions. (Italics added.) However, the court stayed execution of the determinate term because it had relied, in part, on the facts of the noncapital crime in refusing to modify the death verdict.
Defendant insists we must reverse and remand for resentencing because the trial court cited insufficient reasons to support its sentencing choices. Defendant did not raise this claim below. However, his hearing predated our decision in People v. Scott (1994) 9 Cal.4th 331, 353, 357-358 [36 Cal.Rptr.2d 627, 885 P.2d 1040], which imposed a prospective contemporaneous objection requirement on complaints like those raised here. We therefore agree with the parties that the claim has not been forfeited, and that it may be raised for the first time on appeal. (People v. Davis, supra, 10 Cal.4th 463, 552.) Nevertheless, it fails on the merits.
Under the statutes and rules in existence at the time of defendant’s hearing, the trial court was required to state its reasons for making discretionary sentencing choices. Two such choices included imposition of the upper term and the decision to make one sentence consecutive to another. In deciding to aggravate a sentence in this manner, the court was prohibited from using the same reason more than once, and was required to cite different circumstances to support each choice. (See § 1170, subds. (b) & (c); People v. Scott, supra, 9 Cal.4th 331, 349-350.)
The record shows compliance with these rules. The trial court cited two factors in aggravation and no factors in mitigation when sentencing defendant for the forcible rape of Valery C. First, the crime seemed aggravated in the court’s view because the victim was relatively young, i.e., 16 years old. Second, the court found the victim to be “particularly vulnerable.” The court explained at the hearing to modify the death verdict that Valery was pregnant, that she depended on defendant for shelter, and that' she had no other apparent place to go. Contrary to what defendant claims, a crime victim can be deemed vulnerable in this context for reasons not based solely on age, including the victim’s relationship with the defendant and his abuse of a position of trust. (People v. Clark (1990) 50 Cal.3d 583, 638 [268 Cal.Rptr. 399, 789 P.2d 127].) The court properly applied these principles. The record supports the determinate sentence challenged here.
*576 VI. Disposition
We affirm the judgment in its entirety.
George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

 All unlabeled statutory references are to the Penal Code.

 All events mentioned at the guilt phase occurred in the San Fernando Valley area of Los Angeles County.

 Delbert testified that Carol routinely traveled to the bar by taxi and carried a large wallet or small clutch purse.

 According to Carol’s husband, Delbert, a burgundy truck and green car were parked in the driveway the night Carol died. Neither his family nor any of their immediate neighbors owned a red van.

 Delbert never saw a knife in Carol’s possession at the bar or heard her talk about carrying one. Other witnesses gave similar testimony, namely, Russo, the bartender, and Cooper, a regular bar patron. Investigators found no knife in defendant’s car or near Carol’s body.

 At this point in the interview on February 2, 1990, defendant signed a form authorizing a search of his home and car. A short time later, however, he revealed that he could not read or write. Detective Coffey then read the consent form to defendant. He said he understood and agreed with it. Defendant’s car was searched, and the contents were seized, on February 5, 1990.

 Two days later, on February 4, 1990, defendant contacted police from his jail cell. When Detective Coffey alluded to their prior conversation, defendant again denied raping or strangling Carol, or touching Valery C.

 As will become clear, this claim fails, in part, because of how the case was pled and tried. As noted, a sodomy-murder special circumstance accompanied the alleged murder. (§ 190.2, subd. (a)(17)(D).) The prosecution moved to amend the information to allege a rape-murder special circumstance (id., subd. (a)(17)(C)), but the trial court denied the motion as untimely. Hence, sodomy murder was the sole special circumstance alleged and tried here. At trial, the prosecution sought a first degree murder conviction on two theories: felony murder in the commission of rape, and premeditated murder. Sodomy could not be used to prove first degree felony murder when the capital crime occurred. (See § 189, as amended by Prop. 115, approved by voters, Primary Elec. (June 5, 1990); People v. Hart (1999) 20 Cal.4th 546, 580, fn. 2 [85 Cal.Rptr.2d 132, 976 P.2d 683]; Tapia v. Superior Court (1991) 53 Cal.3d 282, 297-299 [279 Cal.Rptr. 592, 807 P.2d 434].) Hence, rape murder was the sole felony-murder theory of first degree murder.

 Section 954.1 states, in part, that where “two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, . . . evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together.” The voters adopted this statute in Proposition 115, which took effect on June 6, 1990. Section 954.1 applies to trials held after its enactment even where, as here, the charged crimes occurred before that time. (Tapia v. Superior Court, supra, 53 Cal.3d 282, 299-300.) Section 954.1 codified existing case law (People v. Osband, supra, 13 Cal.4th 622, 667), and did not materially change the rules of severance. (People v. Arias, supra, 13 Cal.4th 92, 126, fn. 7.)

 In People v. Michaels, supra, 28 Cal.4th 486, we found no Miranda violation under strikingly similar facts. The defendant in Michaels waived his constitutional rights, and was asked to describe the capital crime. He hesitated, saying “ T don’t know if I should without an attorney.’ ” (Id. at p. 509, italics omitted.) The interrogating officer replied that the defendant could stop talking, and that he did not have to answer any question he disliked. The defendant said, “ ‘Okay, that one,’ ” and then confessed. {Ibid., italics omitted.) On appeal, the defendant argued that even if his reference to counsel was ambiguous, he clearly invoked his right to silence by saying “Okay.” Applying Davis, supra, 512 U.S. 452, we rejected the claim. The defendant in Michaels never clearly “assertfed] a right to refuse to answer any questions, ask[ed] that the questioning come to a halt, or requested] counsel.” (People v. Michaels, supra, 28 Cal.4th at p. 510.) As noted above, defendant’s remarks are no less equivocal in the present case.

 At the time of trial, Code of Civil Procedure section 223 stated: “In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases.” (Added by Prop. 115, approved by voters, Primary Elec. (June 5, 1990).) Effective January 1, 2001, the statute was amended to give counsel for each party an expanded, though not unlimited, right to examine prospective jurors through direct oral questioning. However, the provision regarding group voir dire remained unchanged. (Code Civ. Proc., § 223, as amended by Stats. 2000, ch. 192, § 1; People v. Stewart (2004) 33 Cal.4th 425, 455 & fns. 17 & 18 [15 Cal.Rptr.3d 656, 93 P.3d 271].)

 The Attorney General argues that defendant has forfeited his right to complain about the lack of Hovey voir dire because he never sought individual sequestered voir dire of the whole panel below. As noted, the trial court raised the issue sua sponte to address the procedural changes made by Proposition 115. The Attorney General cites no authority for his assumption that such a sua sponte ruling is immune from appellate review. Thus, consistent with other similar cases, we reject the Hovey claim solely on the merits. (See, e.g., People v. Navarette, supra, 30 Cal.4th 458, 490; People v. Slaughter, supra, 27 Cal.4th 1187, 1199; People v. Box, supra, 23 Cal.4th 1153, 1180.)

 The court asked whether jurors, because of their views on capital punishment, and notwithstanding the evidence in the case, would (1) refuse to convict defendant of first degree murder to prevent a penalty trial, (2) refuse to find the special circumstance true to prevent a penalty trial, (3) automatically refuse to vote for death and automatically vote for LWOP, and (4) automatically refuse to vote for LWOP and automatically vote for death.

 Before jury selection, defendant urged the court to ask three additional questions on (1) how prospective jurors would feel about unpleasant photographs of the decedent, (2) whether death should always be the penalty for convicted killers, and (3) whether LWOP is a fair punishment for convicted killers. The trial court agreed to give a modified version of the first question, asking whether the photos would affect jurors’ ability to be “fair.” However, the court concluded that the other two questions were irrelevant and misleading because they did not concern first degree special-circumstance killings, or address the jury’s duty to consider and weigh the evidence. The court also decided that counsel’s questions largely duplicated the written questionnaire and the planned oral examination.

 Evidence Code section 1103, subdivision (a)(1) states, in part, that evidence of a crime victim’s character in the form of “specific instances of conduct’’ is not inadmissible under section 1101 of the same code where the defendant seeks to prove “conduct of the victim in conformity” with such evidence in a criminal case. Proposition 8’s Truth-in-Evidence provision, which ended most restrictions on the use of relevant evidence in criminal cases, explicitly exempted both Evidence Code section 1103 and Evidence Code section 352 from its reach. (See Cal. Const., art. I, § 28, subd. (d); People v. Harris (1989) 47 Cal.3d 1047, 1081-1082 [255 Cal.Rptr. 352, 767 P.2d 619].)

 Evidence Code section 1103, subdivision (c)(1) provides that, “in any prosecution under Section 261 ... or under Section 286 ... of the Penal Code,. . . evidence of specific instances of the complaining witness’ sexual conduct... is not admissible by the defendant in order to prove consent by the complaining witness.” The trial court observed that no “complaining witness” survived the alleged crime and that defendant was not separately charged “under Section 261 ... or under Section 286” with rape and sodomy, respectively. However, to the extent “consent” bore on the rape-murder theory of first degree murder and the sodomy-murder special circumstance, the court ruled that the statute barred evidence that Carol left the bar with other men. The court explained that whether a woman is dead or alive, she should not be “vilified” by her sexual history “on the issue of consent.” On appeal, defendant claims the *548 court erred in applying Evidence Code section 1103, subdivision (c)(1) where, as here, none of the enumerated sex crimes is charged as a substantive offense. However, we need not, and do not, decide the issue. As explained above, the trial court properly excluded the evidence on another viable ground—Evidence Code section 352.

 Defense counsel conceded that his expert witness did “not know how intoxication would affect [Carol], because he didn’t personally know [Carol] or her habits.” Instead, the expert would show “how a certain level of intoxication, namely 0.26 blood alcohol, would affect people in general.”

 Defendant also claims, without meaningful or independent analysis, that the ruling violated his federal and state constitutional rights to present a defense, to effective representation, to due process and equal protection, and to a reliable verdict. Though he invoked none of these theories below, we assume without deciding that the claims have been preserved. (See Yeoman, supra, 31 Cal.4th 93, 117-118, 133.) However, as discussed above, no error of any kind occurred.

 The Attorney General argues that defendant “invited” any instructional error, and is estopped from seeking reversal of the judgment on this ground. Citing the trial court’s statement to this effect, the Attorney General claims defense counsel “agreed” CALJIC No. 10.65 “should not be given as to rape.” However, as explained above, the court appears to have misstated or misinterpreted counsel’s stance. More to the point, the court’s decision to withhold CALJIC No. 10.65 with respect to the felony-murder-rape theory was not induced by defendant, but by the court’s unwavering belief that the instruction lacked evidentiary support. (People v. Lang (1989) 49 Cal.3d 991, 1031-1032 [264 Cal.Rptr. 386, 782 P.2d 627].) There also seems to be no plausible tactical reason why defendant would forgo the chance to escape a first degree murder conviction based on his reasonable belief in consent as to rape. (See People v. Whitt (1990) 51 Cal.3d 620, 641 [274 Cal.Rptr. 252, 798 P.2d 849].) Thus, we reject the claim of invited error.

 The Attorney General insists defendant has forfeited his right to complain about the failure to give CALJIC No. 2.02, because his request for that instruction below did not embrace the modification he now claims should have been made. However, the Attorney General concedes that defendant has not forfeited his closely related claim that the trial court erred in giving an unmodified version of CALJIC No. 2.01, even though defendant did not seek a similar modification at trial. In making the latter point, the Attorney General relies on section 1259, which allows appellate review of “any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby.” This statute seems to preserve all challenges to the circumstantial evidence instructions raised here. (See People v. Smithey (1999) 20 Cal.4th 936, 976, fn. 7 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

 Regarding the Attorney General’s argument that defendant has forfeited all of these claims, we reach the following conclusions. First, because defendant’s objection to the “Jane *560 Doe” remark was promptly overruled, his failure to request a curative admonition seems justified. (People v. Hill, supra, 17 Cal.4th 800, 820-821 [objection and/or request of admonition not required where futile or impracticable].) Hence, this claim has been preserved for appeal. Second, when the trial court sustained defendant’s objection to the “walk” comment, he should have asked that jurors be admonished to disregard it—an omission that is unexcused and that waives the claim. (Id. at p. 820.) Third, defense counsel did not object to any of the other alleged attacks on his integrity. Such claims of misconduct clearly have been forfeited. (Ibid.)

 The Attorney General summarily contends that defendant failed to object on due process grounds below, and that he therefore has forfeited any such constitutional claim on appeal. However, as noted above, counsel explicitly raised defendant’s due process rights when litigating notice under section 190.3. Similar fair trial concerns accompanied all other timely defense objections to admission of the factor (b) sex crimes. Hence, it appears defendant has preserved his present claims insofar as they are framed in due process terms.

 The Attorney General insists defendant moved to exclude this evidence only under Evidence Code section 352 below, and that he therefore has forfeited his constitutional claims. However, as noted above, the court and counsel debated both the relevance and fairness of admitting exhibit No. 85. In so doing, they referred to the same authorities that defendant cites here, including the constitutional principles in Payne, supra, 501 U.S. 808. We therefore reject the proposed procedural bar.

 Defendant cites two other alleged improprieties in the prosecutor’s closing argument, namely, that defense witnesses testified “under subpoena,” and that defense counsel might refer to capital punishment as “state murder.” Counsel successfully objected each time, and the prosecutor admitted in front of the jury that no evidence supported the subpoena reference. Whatever the precise nature of defendant’s vague misconduct claims, the remarks were brief and mild, and the trial court immediately disapproved their use. No harm could have ensued.