Filed 6/24/15  P. v. Salazar CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>NICOLAS SALAZAR,<br><br>    Defendant and Appellant. | F068650<br><br>(Super. Ct. No. MCR043298B)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

James Bisnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P.J., Cornell, J. and Kane, J.

Nicolas Salazar pled guilty to voluntary manslaughter (Pen. Code, § 192, subd. (a))[1] and attempted carjacking (§§ 664, 215, subd. (a)).  He also admitted the voluntary manslaughter count was committed for the benefit of a criminal street gang.  (§ 186.22, subd. (b)(1).)  The parties stipulated the sentence to be imposed as a result of the plea would be 16 years 10 months, consisting of the midterm of six years for the manslaughter conviction, 10 years for the street gang enhancement, and one-third the midterm, or 10 months, for the carjacking count.[2]  The trial court sentenced Salazar pursuant to the terms of the agreement.

Prior to entering into the admission, Salazar moved the trial court to suppress the statements he had made to the police on the grounds that (1) they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436, and (2) they were coerced.  The trial court denied the motion, eventually leading to Salazar's guilty plea.

In his notice of appeal, Salazar asserted the trial court erred in denying his motion to suppress.  Appellate counsel filed a brief pursuant to *People v. Wende* (1976) 25 Cal.3d 436.  By letter dated May 19, 2014, we invited Salazar to submit any additional briefing to support his appeal.  Salazar did not respond to our invitation.

We have reviewed Salazar's motion to suppress and conclude the trial court did not err in denying his motion.  Our review of the remainder of the record did not discover any errors.  Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

The information charged Salazar and his codefendant, Jose Alonzo Vega, with the first degree murder of Jesse Espinoza (§ 187, subd. (a)) and active participation in a criminal street gang (§ 186.22, subd. (a)).  In addition, Salazar was charged with

---

[1]All further statutory references are to the Penal Code unless otherwise noted.

[2]The parties actually agreed to a term of 17 years based on the belief that one-third the midterm for the carjacking count would be one year.

2.

attempted carjacking.  (§§ 664, 215, subd. (a).)  The information also alleged that defendants, if they were adults, would be eligible for a sentence of death or life in prison without the possibility of parole because the crime was committed while defendants were active members in a criminal street gang and the crime was committed for the benefit of a criminal street gang.  (§ 190.2, subd. (a)(22).)  As enhancements, the information alleged Vega personally discharged a firearm resulting in death within the meaning of section 12022.53, subdivision (d), Salazar personally discharged a firearm resulting in death within the meaning of section 12022.53, subdivisions (d) and (e)(1), and the murder was committed for the benefit of a criminal street gang pursuant to section 186.22, subdivision (b)(1).  Finally, the information alleged that both Salazar and Vega were 15 years old at the time the crime was committed.

The charges arose out of an apparent gang encounter.  Espinoza was walking near a fast-food restaurant with a friend when three other youths ran across a busy street to confront them.  Vega and Salazar were two of the three youths, although the third youth was not identified.  Salazar swung at Espinoza's friend, but missed.  Vega pulled out a gun and shot Espinoza.  Vega, Salazar, and the third youth fled the area, but witness statements indicated Vega returned and shot Espinoza two or three more times.

As stated above, Salazar entered into a plea after his motion to suppress his statements to the police was denied.[3]  We will discuss the motion to suppress in detail in the following section.  The trial court fully advised Salazar of his constitutional rights, ensured Salazar was entering into the agreement voluntarily, and advised Salazar of the consequences of his plea.

---

[3]Vega's motion to suppress was granted, and he entered into a plea agreement that resulted in a prison sentence of 31 years.

# DISCUSSION

The possible suppression of Salazar's statements to police first arose during the preliminary hearing. Prior to trial, defense counsel filed a motion to suppress the statements, arguing, in essence, that the interrogating officer violated Salazar's constitutional rights as established in *Miranda*. In a supplemental brief, defense counsel argued the incriminating statements were coerced by the police through implied threats that Salazar faced a prison sentence that would last the rest of his life. We begin with the interviews.

Salazar was arrested shortly after the shooting. The first interview occurred approximately two hours after the shooting. At the beginning of the interview, Salazar identified himself as Omar Castro. After getting some preliminary information, the interrogating detective read Salazar his *Miranda* rights. Salazar stated he understood his rights. The detective then informed Salazar that he did not believe Salazar shot Espinoza, but, because this was a gang-related crime, he would be charged with murder if he was present at the time of the shooting. The detective also informed Salazar he had evidence that Salazar was involved in the altercation. When Salazar denied he was involved with gangs, the detective stated:

> "Well, I can prove otherwise. Okay? This is a gang related shooting. So if you want to tell me exactly what happened, all right, it's going to help you out in the long run, big time, and I don't want to go tell your mom and your family that her son, at 15 years old is going to jail for life. You understand?"

Salazar denied any involvement in the shooting or even knowing what the detective was talking about, despite the detective's numerous statements that he had evidence to prove Salazar was there. Salazar eventually admitted he was in the area at the time of the shooting. Salazar said that when he heard shots, he ran away because he did not want to get shot. The detective attempted to convince Salazar that because he did

4.

not think he was the shooter, Salazar would help his case by explaining what happened. Salazar continued to deny any knowledge of the shooting.

The second interview occurred the following day. The detective began the interview by reminding Salazar of his constitutional rights pursuant to *Miranda*. Salazar again stated he did not do anything and he did not understand why he would go to prison if he did not do anything. The detective informed Salazar that while he believed Salazar did not shoot Espinoza, he did not believe Salazar's claims that he was not involved in the altercation. The detective explained to Salazar that Salazar's conversation with Vega in the interview room the previous day had been recorded, so they knew he (Salazar) was at the scene. At this point Salazar admitted he was there and admitted he had started to fight one of the victims when he heard shots fired. Salazar claimed he did not know who shot Espinoza. Salazar claimed the confrontation was instigated by either Espinoza or the other victim making the gang-related remark, "What's up (Ene)?," referring to the Norteño criminal street gang. Salazar claimed he did not know the identity of the third male in the group. He also claimed he did not know anyone would get shot or that anyone had a gun.

As the interview continued, Salazar admitted he saw Vega with the gun shortly before the shooting, although he was adamant he did not know Vega was going to shoot Espinoza.

Our review of the interviews did not reveal any constitutional violations. Salazar made three arguments in the trial court. First, he argued the interrogating detectives violated his constitutional rights by informing him his statements would not be released to anyone. The part of the interview about which Salazar complains occurred when the interrogating detectives were attempting to convince Salazar to identify the person who had the firearm when the altercation occurred, despite Salazar repeatedly denying

5.

knowing who had the firearm. In an attempt to convince Salazar to identify the shooter, the following colloquy occurred.[4]

> "Q1:  … I know you know who had the gun and I know you saw who had the gun and who did the shooting, okay? Uh, we both don't believe it's you at this point, um, but you're not being honest and if you don't -- if you don't wanna tell me then say, 'You know what? I know who did it but I'm not gonna be a rat.' Be -- be -- do that.
>
> "A:     (Unintelligible) I don't -- I don't know who had the gun and -- and especially I don't know who shot it. I'm tellin' you that everything blacked out as soon as I heard the shots. To me, in my mind, I only heard two shots. That's it 'cause I took off running as soon as I heard the first one. I just took off running. I'm not gonna stay there.
>
> "Q:     Okay (Nick) you being honest in the whole thing there, okay, I think you're being honest throughout, I do. Um, but just like this officer, we've been doin' this a long time, (Nick). We go to a lot of training. We go[] to a lot of schools to be able to tell when people are lying, okay?
>
> "A:     Yes, sir.
>
> "Q:     Right now, man, you're lying about knowing who had the gun. You are.
>
> "A:     (Unintelligible).
>
> "Q:     And (Nick), don't -- don't tell me -- can you just nod your head yes or no? You're lying about who had the gun, right, man?
>
> "A:     No, sir.
>
> "Q:     You are.
>
> "A:     No, sir.
>
> "Q:     You're not?
>
> "A:     No, sir.
>
> "Q:     So you're saying you never saw it that second day?

_____

[4]Because there were two detectives present during this part of the interview, the transcript refers to one detective as "Q" and the other detective as "Q1."

6.

"A: No, sir.

"Q: Okay if we -- if we do a lie detector test right now do you think you'd pass that?

"A: I think so.

"Q: You think so?

"A: Yes, sir.

"Q: But there's a pretty good chance you'd fail, right?

"A: No.

"Q: And you know why? Because you're lying about that, (Nick). Look, man, you gotta let it all go. You gotta let it all out okay? *You're 15. You know what that means? Even if I wanted to I can't release your statements to anybody all right?*

"A: But it's gonna go on paper.

"Q: I -- I do have to document it, (Nick), but that doesn't mean anything. Okay[.] I've gotta document it.

"A: But that thing's gonna go to a person that's gonna get time.

"Q: Okay do you know when that is? Three or four years, (Nick), and guess what, man? You gotta worry about (Nick) right now. You don't need to be sittin' there next to him in three or four years. Do you understand that?

"Q1: Right there by that -- that comment you're sayin' you're scared to be a snitch, correct?

"A: Yeah.

"Q1: Okay.

"A: Well that and then, 'cause what about if I just say it and then at the end I get the same time, you know? What I'm tryin' to do is tryin' to tell you guys the truth. Not for you guys to do whatever you guys gotta do but (unintelligible).

"Q1: But you're leavin' out some important det -- you're leavin' out really important details and I think you -- and you know why you're leavin' 'em

7.

out because you don't wanna say the bad parts because you think it's worse.  Which -- you know, we're not gonna promise you're not gonna go to -- and do any time.  We can't promise that but we can only tell you that tellin' the truth is the best thing.  I truly believe that it's the best thing to do, okay?  I'm not tryin' to lock you up for the rest of your life.  I'm not tryin' to, okay?  But there's a kid that's dead, okay?  A kid that, you know, got shot four times.  I don't think he deserved that.  I don't know if you do.

"A:    No, sir.

"Q:    And (Nick), you say you watch a lot of TV and everything that's your experience with, uh, how this works, right?  You do watch a lotta TV and everything.  Just like this officer said, we can't promise you anything or tell you which way this is gonna go but if you didn't shoot anybody and you're 100 percent honest with us, what do you think's gonna happen to you?

"A:    I'm gonna get less time.

"Q:    Prob -- probably, probably a whole lot less, right?

"Q1:    Were you saying anything gang related when you went over there?  Were you sayin' -- what -- what do you bang, what -- what's that?

"A:    No, I didn't talk.

"Q1:    You're PPL?

"A:    Yes, sir."  (Boldface & italics added.)

Defense counsel argued in the trial court that the detective's statement boldfaced and italicized in the above quoted portion of the interview essentially misrepresented Salazar's constitutional rights by suggesting to Salazar that simply because he was a minor, nothing he said would be used against him.  Defense counsel did not cite any authority for his proposition either in his moving papers or at oral argument.  But his argument is clear:  *Miranda* compels officers to inform a suspect any statement made could be used against the suspect in a court of law, while the detective's statement suggested that any statement made would not be used in court.  It would appear to us that

8.

the argument is that Salazar was coerced into making the statements by the promise that none of the information would be used against him.

While we agree the interrogating detectives were perilously close to violating Salazar's constitutional rights by suggesting his statements could not be used against him in a court of law, under the totality of the circumstances we conclude there is no reversible error. When a defendant's statement is admitted in violation of *Miranda,* we review the record to determine whether the error was harmless pursuant to *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Thomas* (2011) 51 Cal.4th 449, 498; *People v. Peracchi* (2001) 86 Cal.App.4th 353, 363.) Under this standard, reversal is required unless the People establish the error was "harmless beyond a reasonable doubt." (*Chapman, supra,* at p. 24.) "[T]he appropriate inquiry is 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.'" (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.)

Here, all of the facts to support the charges against Salazar were obtained before the detectives' ill-advised comments. Salazar already had admitted his involvement in the altercation that led to the shooting. And the questions were directed at the identity of the individual who shot Espinoza, with the detectives already knowing that Salazar did not shoot Espinoza. Moreover, the comment was aimed at assuring that no one would learn Salazar had identified Vega as the one who possessed the gun. Finally, the detectives did not pursue this argument, instead acknowledging that anything Salazar told them would be documented and eventually would be turned over to Vega's attorneys. Accordingly, any error that occurred was harmless under any standard of review.

Salazar's second argument is that his statements were involuntary because the detectives told him he would get less time in custody if he told the truth. This "argument" was not supported by authority or argument in Salazar's moving paper in the trial court nor during the oral argument on the motion. We fail to see how this comment

9.

would overcome Salazar's rational intellect and free will.  (*Dickerson v. United* States (2000) 530 U.S. 428, 434; *Mincey v. Arizona* (1978) 437 U.S. 385, 398.)

Salazar's third argument is that the detectives ignored his request for an attorney during the first interview.  Throughout this interview, Salazar insisted his name was Omar Castro.  Towards the end of this interview, the detectives challenged Salazar about his identity.  The detectives apparently had a photo identification with Salazar's picture as well as his true name.  The detectives began by telling Salazar he had been lying.

"Q1:   You lied to him about your name, yes?

"A:   (Unintelligible) I lied to you huh.  I don't even know who I fucking lied to.

"Q1:   Yeah, but what did you tell him your name was?

"A:   Omar (unintelligible) Castro.

"Q:   'Kay[,] is that your name?

"A:   Yeah.

"Q1:   No.

"Q:   Well, who's that?

"Q1:   Nicholas Salazar.  'Kay.

"A:   I don't know.

"Q:   When you're booked in juvenile hall, they're going to print you, so you need to be honest now and come clean.  Like I told you, they got video at [the fast-food restaurant].

"A:   I'm Omar Castro.  I was born 7-12-97.  My mom is Maria Castro and I don't know (unintelligible) ***I'm not going to say no more***.  I'm (unintelligible).

"Q:   Who got his name?

"Q1:   Um, Shant.

"A:   What's wrong?  The one with the beard?

10.

"Q1: All right well, let's give him a break. Let's give him a break. We'll go talk to your buddy, okay, and we'll ask him your name. Just relax.

"A: (Unintelligible)

"Q1: You comfortable?

"A: Yeah.

"Q: He's a big one." (Boldface & italics added.)

This was the conclusion of the first interview. Salazar insists his comment, "I'm not going to say no more," was an unequivocal request for an attorney. We disagree.

"In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously*' assert his right to silence or counsel. [Citation.] It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights. [Citation.] Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda* ... either to ask clarifying questions or to cease questioning altogether." (*People v. Stitely* (2005) 35 Cal.4th 514, 535.) "A defendant has not invoked his or her right to silence when the defendant's statements were merely expressions of passing frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular subject covered by the questioning." (*People v. Rundle* (2008) 43 Cal.4th 76, 115, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

It is clear that Salazar's comment was nothing more than passing frustration about the detectives discovering he was lying about his identity. It was not an unequivocal assertion of the right to counsel or the right to remain silent.

### DISPOSITION

The judgment is affirmed.

11.